**No. 17-15229**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

GOVERNMENT OF GUAM,
*Defendant.*

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT OF GUAM
CIVIL CASE NO. 02-00022
THE HONORABLE FRANCES M. TYDINGCO-GATEWOOD

_____

**EMERGENCY MOTION
UNDER CIRCUIT RULE 27-3
FOR STAY PENDING APPEAL**
_____

KEVIN J. FOWLER
DOOLEY ROBERTS FOWLER & VISOSKY LLP
865 South Marine Corps Drive, Suite 201
Tamuning, Guam 96913
Telephone No. (671) 646-1222
Facsimile No. (671) 646-1223

*Attorneys for Appellant
Morrico Equipment, LLC*

## CIRCUIT RULE 27-3 CERTIFICATE

The undersigned counsel certifies the following is the information required by

Circuit Rule 27-3:

**(1) Telephone numbers, email addresses, and office addresses of the attorneys**

**for the Parties.**

*Counsel for the Appellant Morrico Equipment, LLC,*
**Kevin J. Fowler** (fowler@guamlawoffice.com)
865 South Marine Corps Drive, Suite 201
Tamuning, Guam 96913
Telephone No. (671) 646-1222
Facsimile No. (671) 646-1223

*Counsel for Plaintiff-Appellee the United States of America*
**Mikel William Schwab**, Assistant U.S. Attorney (mikel.schwab@usdoj.gov)
U.S. Attorney's Office, District of Guam
Sirena Plaza
108 Hernan Cortez, Suite 500
Hagatna, GU 96910
Tel: (671) 472-7332

**Robert Douglas Mullaney**, Senior Counsel (robert.mullaney@usdoj.gov)
U.S. Department of Justice
Environmental Enforcement Section
Environmental and Natural Resources Division
301 Howard Street, Suite 1050
San Francisco, CA 94105
Tel: (415) 744-6483

**Thekla Hansen-Young** (thekla.hansen-young@usdoj.gov)
P. O. Box 7415
Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-2710

*Counsel for Receiver*
**Vanessa L. Williams**
(vw@guamlawyer.biz, vanessalee.williams@gmail.com)
GCIC Bldg., Ste. 500H
414 W Soledad Ave.
Hagatna, Guam 96910
Tel: (671) 477-1389 ext.121

## (2) Facts showing the existence and nature of the emergency

As set forth more fully in the motion, the District Court entered a January 27, 2017, order allowing a Clean Water Act consent decree receiver to proceed with a procurement solicitation for refuse trucks that was subject to an automatic stay under Guam's procurement code. The stay was in effect because the Superior Court of Guam was in the process of deciding the receiver's complaint for judicial review of a procurement protest decision of Guam's Public Auditor. The auditor had determined that the receiver's solicitation of cab forward refuse trucks, to the exclusion of conventional cab trucks, unlawfully restricted competition. The Superior Court subsequently upheld the auditor's decision in a now final judgment.

In response to appellant's emergency motion for a stay, the District Court allowed the receiver to proceed with the procurement through bid opening, but advised the receiver not to award a contract until the court ruled on appellant's stay motion. The District Court has now denied appellant's stay motion, but ordered the receiver not to award a contract until April 28, 2017, in order to allow for this Court to hear appellant's emergency motion for a stay herein.

Unless the District Court's January 27, 2017, order is stayed, the receiver will proceed with the immediate award of the contract on April 28, 2017, and the contract will be fully performed and the matter rendered moot before the appellant can be heard fully on appeal. Appellant requests that this Court decide appellant's emergency motion by April 26, 2017, as Guam is one day ahead of the mainland United States.

**(3) When and How Counsel Notified**

Counsel were notified when Morrico filed its motion for an emergency stay with the District Court, as necessary to seek an emergency stay from this Court. Counsel Mikel Schwab, Robert Mullaney and Vanessa Wiliams were also notified by email on March 20, 2017, at 7:52 p.m and Counsel Thekla Hansen-Young on March 21, 2017 at 4:58 p.m. Service will be effected by electronic service through the CM/ECF system and by e-mail.

**(4) Submission to the District Court**

The Appellant requested a stay from the District Court on March 21, 2017, which the district court denied.

Date: April 8, 2017

Dooley Roberts Fowler & Visosky LLP


/s/ **Kevin J. Fowler**
Kevin J. Fowler
Attorneys for Appellant
Morrico Equipment LLP

iv

## CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO FRAP 26-1

The undersigned counsel of record for Defendant Appellant Morrico Equipment, LLC submits the following disclosure pursuant to Rule 26-1 of the Federal Rules of Appellate Procedures, identifying any parent corporation and any publicly held corporation that owns 10% or more of the stock of a party:

1.     Morrico Equipment, LLC, Defendant Appellant, is a privately held Guam limited liability company with no parent corporation.

Date:  April 8, 2017

Dooley Roberts Fowler & Visosky LLP


*/s/* **Kevin J. Fowler**
Attorneys for Appellant
Morrico Equipment, LLC

v

## INTRODUCTION

This appeal arises out of a receiver's motion for clarification of the order appointing it. That order authorized the receiver to depart from Guam procurement law if, in the receiver's own best judgment, that was necessary to meet the mandates of a Clean Water Act consent decree. However, the receiver filed its motion after Guam had already met the core objects of that decree, and after the Superior Court of Guam had issued a final judgment determining that the receiver violated Guam law with respect to its procurement of refuse collection trucks. Nonetheless, the District Court of Guam granted that motion, clarifying and affirming that the receiver could depart from Guam law based on the receiver's own judgment. ECF No. 1712 (Exhibit A). But the court then went beyond the clarification that the receiver sought and ordered the receiver to simply let a new procurement for refuse trucks notwithstanding the Superior Court judgment.

## BACKGROUND

The United States filed this Clean Water Act ("CWA") case in 2002 to enjoin the discharge of pollutants from Guam's Ordot Dump. ECF No. 1. The parties entered into a consent decree ("Consent Decree") in 2004. ECF No. 55. The District Court appointed a receiver ("Receiver") in 2008. That order ("Appointment Order") required the Receiver to follow Guam law in letting contracts for Consent Decree projects "unless, in the best judgment of the Receiver, such compliance would

unreasonably delay the progress in meeting the mandates of the Consent Decree." ECF No. 239, p. 16 (Exhibit B). The Receiver currently has operational control over the Guam Solid Waste Authority ("GSWA"), an autonomous agency of the government of Guam. *See*, 10 G.C.A. § 51A103; ECF No. 1668, p. 3, n. 6 (Exhibit C).

In 2011, the Receiver closed the Ordot Dump and opened the Layon Landfill. ECF No. 1668, p. 2, n. 3. The Receiver environmentally closed the Ordot Dump with a cover system as of December, 2015. ECF No. 1677, p. 1. Guam funded those projects with a $202.4 million bond. ECF No. 1668, pp. 3-4. However, the bond was insufficient to pay for the 30-year post-closure care period for the dump, and certain additional projects that were later added to the Consent Decree. *Id*., p. 4.

The additional projects primarily involved upgrades to two residential waste transfer stations and the closure of a third. ECF No. 1668, p. 4. The cost for the additional projects was $9,442,900. *Id.*, p. 6. As of June 30, 2016, the Receiver had approximately $9,500,000 in a Reserve for Unfunded Expenses ("Reserve Fund") to pay for those costs. ECF No. 1687-13 (Exhibit D). The additional projects should be completed by the end of 2017. ECF NO. 1668, pp. 6-7, n. 14. The post-closure care costs for the dump are approximately $15,500,000. *Id.*, p. 9.

On May 2, 2016, the District Court adopted the Receiver's financial plan to fully fund the additional costs by 2023. ECF No. 1668, p. 16. The plan requires the

annual deposit of $4,500,000 into the Reserve Fund from tipping fees of private haulers who collect the island's commercial waste. ECF No. 1634-1, p. 49, Table 17 (Exhibit E); ECF No. 1712, p. 8 ("approximately $374,758.08 per month"). But this plan also includes funding for approximately $15,000,000 of non-consent projects, the construction of a new cell at Layon and the closure of Layon Cells 1 and 2 (the "Layon Cell Work"). ECF No. 1668, p. 10, n. 21.

As of June 30, 2016, the Receiver maintained an approximate $24,000,000 fund balance at the GSWA, comprised of several cash accounts. ECF No. 1687-1, pp. 31-32, Figure 20 (Exhibit F). This is close to the approximate $25,000,000 cost of all remaining Consent Decree projects, excluding the non-consent Layon Cell Work. ECF No. 1634-1, p. 49, Table 16 (Exhibit E). The fund balance includes the $9,500,000 in the Reserve Fund mentioned above, a $10,000,000 cash account, and a few other accounts with several million dollars. ECF No. 1634-1, pp. 38 (Figure 36), 41 (Table 8) and 45 (Table 12)(Exhibit E).

Through the environmental closure of the Ordot Dump, the opening of a new landfill and court approval of a financial plan for the post-closure care of the dump, Guam has met substantially all Consent Decree conditions. The receivership is scheduled for termination in December, 2017. ECF No. 1712, p. 10.

In September, 2014, the Receiver sought to procure "cab forward" refuse collection trucks ("Original IFB") on behalf of the GSWA. ECF No. 1706, p. 7, ¶¶ 1

3

and 2 (Exhibit G). The procurement of these trucks was not a Consent Decree project. *See*, *generally*, Consent Decree, ECF No. 55, pp. 4-5, 8 and 11 (Exhibit H). The trucks only collect residential waste. ECF No. 1712, pp. 7-8. Appellant, Morrico Equipment, LLC ("Morrico"), protested the cab forward specification because it eliminated its "conventional cab" truck that met all other specifications of the Original IFB. ECF No. 1706, p. 7, ¶ 9; *Id.*, p. 9, ¶ 19. Conventional cab trucks are also less expensive than cab forward trucks. ECF No. 1707, p. 11. The Receiver denied that protest. *Id.*, p. 8, ¶ 11.

Guam's Public Auditor upheld Morrico's protest appeal. She determined that the cab forward specification restricted competition and that a conventional cab truck "met GSWA's minimum requirement that the refuse trucks be able to pick up trash safely and efficiently." ECF No. 1706, p. 9, ¶ 19. The Receiver then sued in the Superior Court of Guam for judicial review. *Id.*, ¶ 21. The Superior Court upheld the Public Auditor's decision in a December 16, 2016, final judgment[1] (the "Superior Court Judgment"), and ordered the Receiver to allow the bid of conventional cab trucks. *Id.*, p. 5; *Id.*, p. 14, ¶ 11.

However, shortly before the Superior Court ruled, the Receiver let a new invitation (the "New IFB") for the same cab forward trucks. The Superior Court issued an October 28, 2016, order ("Stay Order") enforcing the automatic stay under

---

[1] The Guam Supreme Court dismissed the Receiver's appeal of the Superior Court Judgment on February 10, 2017 (Exhibit I). *See*, Morrico request for judicial notice.

4

Guam's procurement law, which stayed the New IFB. ECF No. 1686-7 (Exhibit J).

On November 4, 2016, the Receiver filed an ex parte motion[2] for clarification ("Clarification Motion"), asking the District Court to clarify its Appointment Order and to confirm that: 1) "the Receiver has the authority to depart from adherence to Guam's statutes and regulations when, in the judgment of the Receiver, expeditious compliance with the Consent Decree requires it", 2) "that the Receiver is not required by the Court to seek its explicit approval for departing from Guam law" and 3) "the Court approves the Receiver's exercise of authority in issuing" the New IFB. ECF No. 1685, p. 8.

The District Court granted the Receiver's motion in a January 27, 2017, order ("Clarification Order"). ECF No. 1712. The court was "unpersuaded by Morrico's argument that the Receiver's exercise of the authority granted to it under the Appointment Order violates 28 U.S.C. § 959(b)." *Id*., p. 10. The court found that "the cab forward specification is critical to the safety needs of the GSWA and the public" and that "[d]elaying the procurement of these refuse trucks will have an impact on GSWA's resources to complete the Consent Decree projects" on time. *Id*. It then "approve[d] the Receiver's exercise of authority in issuing [the New IFB], as contemplated under the court's Appointment Order, without the pre-approval of this court." *Id*.

---

[2] The Receiver did not serve Morrico and there is no ECF system certificate of service.

However, after fully answering the Receiver's questions, the court then ordered "the Receiver to issue a new invitation for bid [the "Third IFB"] … and include in the procurement record all papers and materials used by GSWA to develop the cab forward specification, including a copy of this Order and Mr. Parker's Declaration." *Id*., pp. 10-11. The District Court denied Morrico's motion for an emergency stay. ECF No. 1736.

## ARGUMENT

An emergency stay should be granted under Fed. R. App. P. 8(a)(1)(A) as Morrico can show that (1) it has a strong likelihood of success on appeal, (2) it will be irreparably harmed, (3) there will be no substantial harm to other parties and (4) the public interest favors a stay. *See*, *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). "The first two factors are the most critical." *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

This Court has jurisdiction over this final, post-judgment, collateral consent decree receivership order, which had the effect of dissolving an injunction against the Receiver under the Stay Order and the Superior Court Judgment. *See*, 28 U.S.C. §§ 1291 and 1292(a)(1) and (2). Morrico has standing to appeal the District Court's Clarification Order, though not a party, because it participated substantively in the proceedings before the lower court and the equities weigh in favor of hearing the appeal. *See*, *e.g*., *Bank of America v. M/V Executive*, 797 F.2d 772, 774 (9th Cir.

6

1986)(citing *United States v. Conforte*, 643 F.2d 641, 643 (9th Cir. 1981)). *See*, *also*, *Keith v. Volpe*, 118 F.3d 1386, 1390 (9th Cir. 1997); *Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1113 (9th Cir. 1999); *Devlin v. Scardelletti*, 536 U.S. 1, 7, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002).

### A.     Likelihood of Success on the Merits.

This Court has noted that different formulations are used to analyze this factor. However, it clarified that "[a]ll of these formulations indicate that, 'at a minimum,' a petitioner must show that there is a 'substantial case for relief on the merits.' … The standard does not require the petitioners to show that 'it is more likely than not that they will win on the merits.'" *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012)(citing *Leiva–Perez v. Holder*, 640 F.3d 962, 966-68 (9th Cir.2011)(per curiam)).  Morrico has a "substantial case for relief on the merits."

### 1.     The New IFB was Void Under Guam Law.

The Superior Court's Stay Order was a textbook application of the automatic procurement stay that arises upon the timely filing of a protest.  *See*, 5 GCA § 5425(g)("[i]n the event of a timely protest … the Territory shall not proceed further with the solicitation or with the award of the contract prior to final resolution of such protest, ***and any such further action is void*** … .")(emphasis added).  Because the Receiver released the New IFB while Morrico's protest was pending before the Superior Court, the release of the New IFB was void.

## 2.     The Appointment Order Violated 28 U.S.C. § 959(b).

The District Court held that it intended the Appointment Order to authorize the Receiver to determine in its own judgment whether to violate local law.  ECF No. 1712, p. 10.    But this is contrary to 28 U.S.C. § 959(b), which provides that a "receiver … shall manage … the property in his possession … according to the requirements of the valid laws of the state … ."  It is actually a crime for a receiver to willfully violate local law.  18 U.S.C. § 1911.  The United States Supreme Court has explained that "there seems no ground whatever for saying that Congress cannot withhold or withdraw from courts of equity the right to empower receivers in conservation proceedings to disregard local statutes."  *Gillis v. State of California*, 293 U.S. 62, 66, 55 S.Ct. 4, 79 L.Ed. 199 (1934).

In *LaShawn v. Barry*, 144 F.3d 847 (D.C. Cir. 1998), for example, a trial court erred in providing a receiver authority to waive local law based on that receiver's own discretion.  "The Receiver … has been authorized to disregard District law in a whole host of areas.  While it is true that the Receiver is required to conclude that relevant local laws 'unreasonably interfere' with her ability to discharge her responsibilities, the district court has never concluded that compliance with District law, as a general matter, precludes the Receiver from enforcing the consent decree."  *LaShawn*, 144 F.3d 847, 854.  Accordingly, the District Court erred in vesting the Receiver with authority to violate local law based on the Receiver's own judgment.

### 3. The Receiver Never Sought a Specific Waiver of Local Law.

The Receiver never sought a waiver of local law, even after the Superior Court issued the Stay Order. It simply wanted the District Court to confirm that it could violate local law based on its own judgment, that it properly did so when issuing the New IFB, and that it did not have to obey the Stay Order.

The Receiver acknowledged that the relief it sought was in "stark contrast to requiring the Receiver to first obtain an order from the Court waiving the Receiver's compliance with Guam's statutes and regulations", which was the procedure employed by the court in *Plata v. Brown*, 2011 WL 3759472 (N.D. Cal. 2011), to which the Receiver cited in its Clarification Motion. *See*, ECF No. 1685, p. 7. The *Plata* court authorized a waiver after finding that the receiver "'made all reasonable efforts to exercise his powers ... in a manner consistent with California state laws' but that a 'state law' or 'state inaction' is 'clearly preventing him from developing or implementing a constitutionally adequate medical health care system' and that 'other alternatives are inadequate.'" *Plata v. Brown*, 2011 WL 3759472, * 1. The District Court here made no similar finding that the Receiver's inability to lawfully procure refuse trucks was "clearly preventing" it from stopping the CWA violations at the Ordot Dump.

It should be noted that the *Plata* receiver was appointed to provide medical services in a prison system facing horrendous emergency conditions. But, in

analyzing contracting statute waiver requests, the court nonetheless "also affirmed …
that the fundamental purposes underlying State contracting law – preventing fraud
and corruption, ensuring transparency and procedural fairness, and protecting the
public interest – should be preserved as much as possible." *Plata v. Schwarzenegger*,
2007 WL 2318898, * 2 (N.D.Cal. 2007).

This was emphasized by the court in *LaShawn v. Barry*, 144 F.3d 847, which
held that the "district court needs to consider each contemplated violation of District
law on a case-by-case basis" and must also "identify the specific federal law ground
it is using as the justification for the Receiver's authority to transcend local law." *Id*.,
at 854-55. *See*, *also*, *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Circuit 1997)(despite
federal polices vindicated by consent decree, "the court failed to identify a single
federal law that would justify its overriding state law").

The Receiver and the District Court did not identify any local law that
frustrated the objectives of federal law or Consent Decree enforcement. This was
error, particularly since the procurement of refuse trucks was not a Consent Decree
project.

### 4.    The District Court Erroneously Exercised Jurisdiction.

The District Court did not have jurisdiction to override the Stay Order and the
Superior Court Judgment. Further, any decision that this was necessary in order to
timely meet the mandates of the Consent Decree would be error as Guam had already

met the core obligations of that decree.

In discussing federalism principles underlying the Anti-Injunction Act, this Court has explained that "allowing L-P to lose on the merits in state court, yet run to federal court for an injunction just days before the state court decision achieved preclusive status, offends the very principles of equity, comity, and federalism that undergird the Anti-Injunction Act." *Sandpiper Village Condominium Ass'n, Inc. v. Louisiana-Pacific Corp.*, 428 F.3d 831, 852 (9th Cir. 2005). This Court also stated that "[a]t some point, federal courts must accept that a state court action has progressed too far to warrant intervention, even if a technical prerequisite to final judgment remains." *Id.*, n. 29. Morrico argued that the District Court could not enjoin the Superior Court proceedings. ECF No. 1699, p. 1; ECF No. 1706, p. 3.

In *Sec. & Exch. Comm'n v. United Fin. Grp., Inc.*, 576 F.2d 217 (9th Cir. 1978), this Court held that a receiver should be bound by a judgment that it voluntarily litigated in state court. "When a dispute arose, however, over whether Section 959(a) permitted the action to be maintained without leave of the receivership court, the California courts, having personal jurisdiction of the parties, were obliged to adjudicate that issue. The receiver litigated the issue in the trial court, appealed the adverse ruling, but was unsuccessful. Having litigated it fully and fairly, the receiver is bound by the resulting judgment." *Id.*, at 221 (citing *Treinies v. Sunshine Mining Co.*, 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85 (1939); *Morris v. Jones*,

329 U.S. 545, 67 S.Ct. 451, 91 L.Ed. 488 (1946)).

This Court also quoted the Supreme Court's admonition that: "'Public policy dictates that there be an end of litigation; . . . We see no reason why this doctrine should not apply in every case where one voluntarily appears, presents his case and is fully heard, and why he should not, in the absence of fraud, be thereafter concluded by the judgment of the tribunal to which he has submitted his cause.'" *Id.*, (quoting *Baldwin v. Traveling Men's Assoc.*, 283 U.S. 522, 525-26, 51 S.Ct. 517, 518, 75 L.Ed. 1244 (1930)).

In *Upper Chattachoochee Riverkeeper v. City of Atlanta*, 701 F.3d 669 (11th Cir. 2012), a district court improperly enjoined and removed to federal court, certain state administrative proceedings to establish water service agreements between Atlanta and the municipality of Sandy Springs. Atlanta sought to enjoin those proceedings as they would affect its ability to fund compliance with a CWA consent decree. *City of Atlanta*, 701 F.3d 669, 673. The Eleventh Circuit held that there was no authority under the All-Writs Act to enjoin, remove and administer those state law proceedings. *Id.*, pp. 677-78 ("If the water system revenue declines for any reason, the problem will affect the bond holders and the city of Atlanta. It will not affect the federal court's jurisdiction over the consent decrees and over their enforcement.").

Regarding the CWA and supplemental jurisdiction, the court explained that the "factual predicate [for the CWA litigation] was a sewer system that was in

violation of federal clean water laws. The state service delivery proceedings about the source of Sandy Springs' water service do not derive from a polluting sewer system or any federal [CWA] violations." It then held that "Atlanta's test for supplemental jurisdiction would grant federal courts jurisdiction over any state law claim that could potentially affect revenues used to comply with a federal court decree, regardless of the claims' factual predicate." *City of Atlanta*, 701 F.3d 669, 680. The court concluded that "[s]upplemental jurisdiction is not that malleable." *Id*.

Similarly, a dispute over the design of a truck cab does not derive from CWA violations at the Ordot Dump and it does not threaten the finality of the Consent Decree for purposes of the All Writs Act. Also, the District Court could not exercise removal jurisdiction since a plaintiff (here the Receiver) cannot remove its own case to federal court. *See*, *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 104-105, 61 S.Ct. 868, 85 L.Ed. 1214 (1941).

Finally, the District Court erred in holding that it was necessary to immediately procure new trucks so as not to unreasonably delay meeting the mandates of the Consent Decree. Guam has met the core obligations of that decree. The remaining transfer station work the Receiver is overseeing is budgeted at around $9,500,000 and the Receiver has $9,500,000 in its Reserve Fund dedicated to pay those costs. ECF No. 1668, p. 6; ECF No. 1687-13. That work should be completed and the receivership terminated by December, 2017. In addition, the GSWA is not

even responsible for collecting the commercial tipping fees that are dedicated to fund the Ordot Dump's post-closure care, which will be handled by a trustee.  ECF No. 1668, p. 10.

There was no jurisdictional basis for the District Court to enter an order that effectively enjoined the Stay Order and the Superior Court Judgment.

### 5.  The District Court Should Have Abstained.

Even if the District Court otherwise had jurisdiction, its Clarification Order ran afoul of the *Younger* abstention doctrine, a basis on which Morrico also objected. ECF No. 1706, p. 3.   Four factors are analyzed under the *Younger* doctrine. "[A]bstention in favor of state judicial proceedings is required if the state proceedings (1) are ongoing, (2) implicate important state interests, and (3) provide the plaintiff an adequate opportunity to litigate federal claims."  *Hirsh v. Justices of Supreme Court of State of Cal.*, 67 F.3d 708, 712 (9th Cir. 1995)(citing *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515 (1982)). The fourth factor requires that the exercise of federal jurisdiction would enjoin or have the effect of enjoining the state proceeding.  *San Jose Silicon Valley Chamber of Commerce Political Action Committee v. City of San Jose*, 546 F.3d 1087, 1095 (9th Cir. 2008).

The Receiver's judicial review proceeding was pending in local court, with government agencies opposing each other as adverse parties.  ECF No. 1706, p. 5.

That proceeding implicated important local interests in the expenditure of public funds to acquire refuse trucks for Guam's solid waste system. *See*, *e.g.*, *Woodfeathers, Inc., v. Washington County, Or.*, 180 F.3d 1017, 1021 (9th Cir. 1999)(Holding that district court should have abstained in part because "[w]e conclude that the County's enforcement of its solid waste ordinance implicates important state interests for the purpose of *Younger v. Harris*.").

Guam also has a substantial interest in the enforcement of Public Auditor decisions and the judgments of its courts. In *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12-13, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), the Court explained that it "repeatedly has recognized that the States have important interests in administering certain aspects of their judicial systems." It found that there "is little difference between the State's interest in forcing persons to transfer property in response to a court's judgment and in forcing persons to respond to the court's process on pain of contempt." *Id.*, at 13.

Also, the Receiver did not raise any federal claims in the local proceeding and the Clarification Order effectively enjoined the Stay Order and the Superior Court Judgment, satisfying the third and fourth *Younger* factors.

Because all factors under *Younger* were satisfied the District Court was required to abstain. *See*, *Nichols v. Brown*, 945 F.Supp. 2d 1079, 1097 (C.D. Cal. 2013).

### 6. The District Court Could Not Conduct Appellate Review.

This District Court held a hearing on the Receiver's Clarification Motion on January 13, 2017. The court advised the parties that it would not engage in appellate review of the Public Auditor and Superior Court decisions, to which Morrico had objected. ECF No. 1723, p. 6; ECF No. 1706, p. 3. But the court then engaged in appellate review by determining that a cab forward design was safer than a conventional cab design, basically overruling the Superior Court Judgment.

Only the United States Supreme Court can conduct appellate review of final judgments arising out of state court proceedings. *See*, *Henrichs v. Valley View Development*, 474 F.3d 609, 613 (9th Cir. 2007). This Court held in *Henrichs* that "the clearest case for dismissal based on the *Rooker-Feldman* doctrine occurs when 'a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision … ." *Id.* (citing *Noel v. Hall*, 341 F.3d 1148, 1164 (9th Cir. 2003)). But, here, the Receiver was not even a "federal plaintiff," as it did not file a complaint in the District Court seeking a declaratory judgment or any other form of relief.

Also, the District Court did not have the record of the local proceedings before it and provided no deference to the Public Auditor's findings as required by Guam law. *See,* 5 GCA § 5704 (auditor determinations are "final and conclusive unless arbitrary, capricious, fraudulent, clearly erroneous, or contrary to law"). For

example, the court stated that the auditor's determination on safety was based merely on the absence of specification development papers in the Receiver's procurement record. ECF No. 1712, p. 10, n. 15. However, this ignores that the Public Auditor pointedly found that "*there was no evidence presented that cab forward models cause fewer injuries to person or property than conventional cabs*." ECF No. 1694, p. 11 (emphasis added).

The District Court erred in conducting appellate review after advising Morrico that it would not do that, it was without appellate jurisdiction, and it was error to refuse to provide deference to the Public Auditor's determinations as required by Guam law.

### 7. The Court Erred in Authorizing the Third IFB.

The only question the receiver asked the District Court in its Clarification Motion was whether it had authority under the Appointment Order to violate local law based on its own judgment. That question simply raised the issue of whether this was proper under 28 U.S.C. § 959(b). However, after answering that question in the affirmative, the Court then ordered the Receiver to let the Third IFB.

Morrico could not know that the District Court would do this since the Receiver did not request that relief in its motion. The District Court basically made an emergency procurement decision outside the provisions of Guam law that allow for that. *See*, 5 GCA § 5425(g)(1), (2) and (3). That determination would require the

17

concurrence of the Superior Court of Guam before whom Morrico's protest was pending. And the only basis for an emergency declaration was that the Receiver did not want to obey the Stay Order and the Superior Court Judgment. Refusing to obey a lawful Superior Court judgment does not create an emergency. The District Court did not have jurisdiction to confirm an emergency under Guam's procurement code, and an emergency cannot be confirmed based on the refusal to obey a judgment.

Morrico has shown a "substantial case for relief on the merits" and that it is likely to prevail on appeal, thus justifying an emergency stay.

## B.    Irreparable Injury.

Morrico will sustain irreparable injury because it has been precluded from participating in a public procurement for refuse trucks, rights it had under the Stay Order and the Superior Court Judgment. It is routinely recognized in procurement cases that the unlawful exclusion of a bidder from a public procurement constitutes irreparable harm because they are limited to recovery of bid preparation costs. *See*, 5 G.C.A. §5425(h)(limiting remedy to bid preparation costs).

In *Acrow Corp. of Am. v. United States*, 97 Fed. Cl. 182, 188-89 (2011)(citation omitted), the court explained that "if an action before the Court of Federal Claims that only allows recovery of 'bid preparation costs in a suit for damages, but not loss of anticipated profits,' leaves a bid protestor irreparably harmed … the same harm exists pending resolution of the appeal." *See*, *also*, *MVM,*

*Inc. v. United States*, 46 Fed. Cl. 137, 142–43 (2000).

In absence of an emergency stay Morrico will suffer irreparable injury.

### C.    Substantial Injury to Other Parties.

No other parties will sustain substantial injury.  The United States achieved its principal objectives in this case through the closure of the Ordot Dump and the opening of the Layon Landfill.  The design of a refuse truck cab has nothing to do with the CWA violations sued on herein, which the Receiver has fixed.

Guam, as explained below, will be injured by allowing the Receiver to violate Guam law, the Stay Order and the Superior Court Judgment.  It will not be harmed by a stay, however.

### D.    Where the Public Interest Lies.

The paramount public interest is for the Receiver to follow Guam's procurement law.  The public policies of that law are: "to provide for increased public confidence in the procedures followed in public procurement", "to ensure the fair and equitable treatment of all persons who deal with the procurement system of [the] Territory", "to provide increased economy in territorial activities and to maximize to the fullest extent practicable the purchasing value of public funds of the Territory", "to foster effective broad-based competition within the free enterprise system" and "to provide safeguards for the maintenance of a procurement system of quality and integrity."  5 GCA §§ 5001(3), (4), (5), (6) and (7).

All of those policies are implicated here.  *See*, *Essex Electro. v. United States,* 3 Cl.Ct. 277, 288 (1983)(noting "the public interest in insuring the integrity of the procurement process.").  *See*, *also*, *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003)("the public's interest likewise lies in preserving the integrity of the competitive process … except in circumstances not yet demonstrated here, the automatic stay should prevail.").

The GSWA's operation of a residential refuse collection service is not required by any federal law and, in fact, Guam's established public policy is to privatize refuse collection.  *See*, 10 GCA § 51101(5).  The public interest here lies in favor of maintaining the integrity of Guam's procurement system, and respect for its Public Auditor's decisions and court judgments.

**E.    Bond.**

Under Guam law, an automatic stay arose upon the filing of Morrico's protest and without the necessity of a bond, which was confirmed in the Stay Order.  The Superior Court Judgment requires the Receiver to allow the bid of Morrico's conventional cab truck.  Accordingly, Morrico should not have to post a bond for security as a condition of obtaining an emergency stay of the Clarification Order, which dissolved or enjoined the Stay Order and the Superior Court Judgment

//

Date: April 8, 2017

Dooley Roberts Fowler & Visosky LLP

/s/ **Kevin J. Fowler**
Kevin J. Fowler
Attorneys for Appellant
Morrico Equipment LLP

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2017, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by

the appellate CM/ECF system and by e-mail.


Date:  April 8, 2017

Dooley Roberts Fowler & Visosky LLP


/s/ **Kevin J. Fowler**
Kevin J. Fowler
Attorneys for Appellant
Morrico Equipment LLP

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Motion complies with the type-volume limitation of Fed. R. App. P. 27 because it contains 4,950 words. This Motion complies with the typeface and the type style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

Date: April 8, 2017

Dooley Roberts Fowler & Visosky LLP

/s/ **Kevin J. Fowler**
Kevin J. Fowler
Attorneys for Appellant
Morrico Equipment LLP

**EXHIBIT A**

**ECF No. 1712 Order re *Ex Parte* Motion for Clarification**

**(January 27, 2017)**

1
2
3
4
5
6                          DISTRICT COURT OF GUAM

7                            TERRITORY OF GUAM

8    UNITED STATES OF AMERICA,                    CIVIL CASE NO. 02-00022

9            Plaintiff,

10   vs.

11   GOVERNMENT OF GUAM,                                    **ORDER**
                                              re *Ex Parte* Motion for Clarification
12           Defendant.

13

14          Pending before the court is the Receiver's *Ex Parte* Motion for Clarification ("Motion for

15   Clarification"). *See* ECF No. 1685. Therein, the Receiver requested that the court clarify its Order

16   re Appointment of Receiver specifically with regard to the provision in said order that authorized

17   the Receiver "[t]o enter[] into future contracts deemed necessary" and to "follow the procedures

18   required in Guam's statutes and regulations, unless, in the best judgment of the Receiver, such

19   compliance would unreasonably delay the progress in meeting the mandates of the Consent

20   Decree[.]" *See* Order Re: Appointment of Receiver (Mar. 17, 2008) (the "Appointment Order")

21   at 16, ECF No. 239. Having read the filings from the parties, the Receiver and Morrico Equipment

22   LLC ("Morrico") and heard argument on the matter, the court now issues the following Order.

23                                    **BACKGROUND**

24          On March 17, 2008, the court appointed as Receiver the solid waste management consulting

25   firm Gershman, Brickner & Bratton, Inc. ("GBB") and vested GBB with broad authority and power

26   ///

27   ///

1  over the Solid Waste Management Division of the Department of Public Works[1] to ensure the

2  Government of Guam's prompt compliance with the mandates of the Consent Decree. *See*

3  Appointment Order, ECF No. 239. Pursuant to the Appointment Order, the court authorized the

4  Receiver "[t]o enter[] into future contracts deemed necessary" and to "follow the procedures required

5  in Guam's statutes and regulations, unless, in the best judgment of the Receiver, such compliance

6  would unreasonably delay the progress in meeting the mandates of the Consent Decree[.]" *Id.* at 16.

7        On September 18, 2014, the Guam Solid Waste Authority ("GSWA") issued an Invitation

8  for Bid ("IFB") to solicit bids on two categories of refuse collection trucks.[2] The IFB specified that

9  the cab and body should be "cab forward."[3] *See* Decl. R. Chace Anderson at 2, ECF No. 1686.

10 Chace Anderson, the Receiver Operations Manager, was responsible for drafting the IFB. Morrico

11 received a copy of the IFB on September 19, 2014.

12       On September 23, 2014, GSWA held a mandatory pre-bid conference, which Morrico

13 attended. K. Fowler Decl. at ¶3, ECF No. 1694, and Ex. 1 thereto, Office of the Public Auditor

14 ("OPA") Decision (Feb. 20, 2015), Findings of Fact at ¶4. During this conference, GSWA indicated

15 it would not consider any conventional cab trucks. *Id.*

16       On September 25, 2014, Morrico submitted a written pre-bid question to GSWA requesting

17 that the bid specification allow for a conventional cab design. *Id.* at ¶5. On October 1, 2014, GSWA

18 issued to prospective bidders Addendum 1 to IFB GSWA001-15, which amended certain

19 specifications but did not amend the cab forward specification to permit a conventional cab design

---

21  [1]  Guam Public Law 31-020 converted the Solid Waste Management Division ("SWMD")
22  to the Guam Solid Waste Authority ("GSWA"), an autonomous, public corporation of the
    Government of Guam. 10 GUAM CODE ANN. § 51A103. The court thereafter vested the Receiver
23  with "full power and authority over GSWA, to the full extent of its previously granted authority over
    SWMD." Order (Sept. 2, 2011) at 9, ECF No. 798.

24       [2] This particular IFB was numbered IFB GSWA-001-15. *See* Decl. R. Chace Anderson at 2,
25  ECF No. 1686. It was for three 25-cubic yard refuse collection trucks and two 10-cubic yard refuse
    collection trucks. *Id.*
26
27       [3] "Cab forward" trucks are also known as "flat nose" or "cab over" trucks. Decl. R. Chace
    Anderson at ¶7, ECF No. 1686.

1  or otherwise address the request by Morrico. *Id.* at 6.

2       On October 9, 2016, Morrico protested the cab forward specification. Decl. R. Chace

3  Anderson at 2, ECF No. 1686. GSWA denied the protest as untimely and advised Morrico that the

4  cab forward specification was necessary to meet GSWA's needs. *Id.*

5       On November 6, 2014, Morrico filed a procurement appeal with the OPA. OPA Decision

6  (Feb. 20, 2015), Findings of Fact at ¶12, Ex. 1 to ECF No. 1694. On February 20, 2015, the OPA

7  determined that Morrico's protest was timely and that the cab forward specification unnecessarily

8  restricted competition[4] in violation of 5 GUAM CODE ANN. § 5268(a).[5] OPA Decision (Feb. 20,

9  2015), Conclusions of Law at ¶¶1-2, Ex. 1 to ECF No. 1694. The OPA thus ordered GSWA to

10  immediately amend the IFB to allow vendors to bid conventional cab models for the refuse

11  collections trucks. *Id.* at ¶3.

12       On March 6, 2015, GSWA filed a Verified Complaint for Judicial Review before the

13  Superior Court of Guam. *See* Findings of Fact and Conclusions of Law at ¶21, *GSWA v. Brooks*,

14  Superior Court of Guam Civil Case No. CV0185-15, attached as Ex. B to ECF No. 1706. On

15  August 2, 2016, the Superior Court of Guam held a bench trial and gave the parties an opportunity

16  to file post-trial briefs. *Id.* at ¶32. The Superior Court of Guam took the matter under advisement

17  following a status hearing held on September 12, 2016. *Id.* at ¶36.

18       On October 14, 2016 – before the Superior Court of Guam decided the matter – the Receiver

19  ///

20

21

22       [4] In coming to this decision, the Public Auditor noted that "the procurement record includes
no papers or material used by GSWA in the development of the IFB specifications. . . . Without this

23  information, the Public Auditor cannot review GSWA's justification in requiring only the cab
forward specifications in the IFB." OPA Decision (Feb. 20, 2015) at 9-10, Ex. 1 to ECF No. 1694.

24       [5] This provision of Guam's Procurement Law states:

25
        Specifications shall not include requirements, such as but not limited to restrictive
26       dimensions, weights or materials, which unnecessarily restrict competition, and shall
        include only the essential physical characteristics and functions required to meet the
27       Territory's minimum needs.

United States of America v. Government of Guam, Civil Case No. 02-00022                    page 4 of 11
Order re Motion for Clarification

1   issued IFB GSWA-002-017,[6] pursuant to the authority granted to it by the court's Appointment

2   Order.[7] Decl. R. Chace Anderson at ¶16, ECF No. 1686. This IFB also called for "cab over" trash

3   trucks. *Id.* and Ex. F thereto. Mr. Anderson stated the Receiver issued this IFB because it could no

4   longer wait to procure the trucks. *Id.* at ¶17. He noted that "GSWA's current fleet is well past its

5   useful life expectancy," and that "repairs and maintenance costs has almost doubled since FY2014."

6   *Id.*

7           On October 28, 2016, Morrico asked the Superior Court of Guam to stay IFB GSWA-002-

8   017 and refrain GSWA from purchasing any new trucks. *Id.* at ¶18. The Superior Court of Guam

9   granted the request that same day. *Id.* and Ex. G thereto.

10          On November 4, 2016, the Receiver filed the instant *Ex Parte* Motion for Clarification. ECF

11  No. 1685. The United States, the Government of Guam, and Morrico were all given an opportunity

12  to respond to the Receiver's motion. *See* ECF Nos. 1693-94, 1696-98. Additionally, the Receiver

13  filed a Reply brief to Morrico's response. *See* ECF No. 1707.

14          On December 16, 2016, the Superior Court of Guam issued its Findings of Fact and

15

16          [6] Similar to the original IFB issued by GSWA in 2014, IFB GSWA-002-017 sought bids for
17  three 25-cubic yard refuse collection trucks and two 10-cubic yard refuse collection trucks. *See* Decl.
    R. Chace Anderson at ¶16, ECF No. 1686, and Ex. F thereto.

18          [7] The IFB stated:

19
            The services GSWA provides to its paying customers is important both to the health
20          of the community and the environment. Compliance with the Consent Decree is
            required through Orders of the District Court and to comply with federal law. The
21          Government of Guam has decided to finance both the operations of GSWA and
            certain aspects of the Consent Decree through fees charged to the customers of
22          GSWA. The revenue generated by GSWA is vital to completion of the Consent
            Decree projects. Given that maintaining a fleet of trash collection vehicles is vital
23          to the operations of GSWA and thus vital to the revenue necessary to complete the
            Consent Decree, the Receiver is invoking its authority to depart from Guam Law for
24          this procurement as it relates to protests by bidders or prospective bidders and any
            other provision of Guam Law or regulation that would, in the best judgment of the
25          Receiver unreasonably delay meeting the mandates of the Consent Decree.
26

27  Decl. R. Chace Anderson at ¶16, ECF No. 1686 and Ex. F thereto.

United States of America v. Government of Guam, Civil Case No. 02-00022                                  page 5 of 11
Order re Motion for Clarification

1   Conclusions of Law with regard to the Receiver's Verified Complaint for Judicial Review and

2   affirmed the OPA's Decision. *See* Ex. B to ECF No. 1706. GSWA was ordered to immediately

3   amend the IFB to allow vendors to bid conventional cab models for the refuse collection trucks. *Id.*

4   at 9. Morrico asked this court to take judicial notice of said Findings of Fact and Conclusions of

5   Law, as well as the Judgment issued in the Superior Court of Guam action. *See* ECF No. 1706. The

6   court orally granted this request on January 13, 2017. *See* Minutes, ECF No. 1708.

7                                              **DISCUSSION**

8          In the instant motion, the Receiver seeks clarification from the court regarding the authority

9   granted to it under the court's Appointment Order. The Receiver asks the court to explicitly find that

10  (1) the Receiver has the authority to depart from adherence to Guam's statutes and regulations when,

11  in the judgment of the Receiver, expeditious compliance with the Consent Decree requires it, (2) the

12  Receiver is not required by this court to seek its explicit approval for departing from Guam law but

13  instead may rely on its "best judgment" as authorized by this court's Appointment Order, and (3) the

14  court approves the Receiver's exercise of authority in issuing IFB GSWA-002-017, to immediately

15  proceed with the purchase of refuse collection trucks in order to timely meet the mandates of the

16  Consent Decree. Mot. for Clarification at 8, ECF No. 1685.

17         The court notes that before it made the difficult decision to appoint a Receiver, it interviewed

18  seven of the nine candidates nominated by the parties. Appointment Order at 8, ECF No. 239. The

19  court ultimately selected GBB as the most qualified among the nominees. In drafting the

20  Appointment Order, the court was cognizant of the fact that GBB, an international consulting firm,

21  had decades of experience in solid waste management, and the court would have to rely on and

22  sometimes defer to GBB's expertise to ensure expeditious compliance with the Consent Decree. The

23  need for cab forward refuse collection trucks is one of those instances when the court defers to the

24  Receiver's expertise on the matter.

25         Chace Anderson, the Receiver Operations Manager, has over 20 years of waste management

26  experience. Decl. R. Chace Anderson at ¶1, ECF No. 1686. In Mr. Anderson's professional

27  experience and opinion, cab forward trucks are "demonstrably safer refuse collection trucks for both

1    the driver and the community than the conventional cab." *Id.* at ¶7. Relying on a study conducted

2    by the United States Bureau of Labor and Statistics, Mr. Anderson asserts that "[r]efuse and

3    recycling collectors are the fifth most dangerous civilian occupation , in terms of risk of death or

4    injury to the workers in America." *Id.* and Ex. A thereto. Mr. Anderson notes that even the

5    Government of Guam recognizes the inherent danger in refuse collection since it provides these

6    workers with hazardous pay. *Id.* Based on both his personal and professional experiences,

7    Mr. Anderson states that cab forward trucks "are the industry standard in refuse collection in urban

8    areas on the U.S. mainland and Europe." *Id.* at ¶8.

9         Mr. Anderson's opinion is bolstered by the Declaration of Thomas D. Parker. *See* ECF No.

10   1697. Mr. Parker is a Licensed Professional Engineer with "over 30 years of civil and environmental

11   engineering experience specializing in solid waste management, with particular expertise in

12   evaluating safety in the solid waste industry." Decl. Thomas D. Parker at ¶1, ECF No. 1697.

13   Mr. Parker currently serves as the Safety Committee Chair of the Solid Waste Association of North

14   America ("SWANA").[8] *Id.* In this capacity he "advise[s], monitor[s], provide[s] training, and

15   develop[s] programs on safety in the solid waste industry" and has "authored a number of safety

16   publications." *Id.* A July 2016 article Mr. Parker co-authored "confirms that for the second

17   consecutive year, waste and recyclable collection employees had the fifth highest worker fatality rate

18   for all occupational categories." *Id.* at ¶4. Furthermore, "[ a]ccording to an analysis performed by

19   SWANA, a disproportionate number of these fatalities occurred at small employers, such as

20   GSWA's collection operation on Guam." *Id.* Specifically with regard to refuse collection trucks,

21   Mr. Parker states:

22              The collection truck is a *critical* safety component in the solid waste industry.
         Collection trucks with a cab forward (also referred to as cab over) design, as required
23       by the Receiver in its solicitation specification, is the *industry standard* in the United
         States for safety reasons. Cab forward trucks have significantly greater visibility for
24       the driver, which is particularly important in areas that have potential poor sight
         distances, narrow roads, the possibility of people or animals entering the roadway
25       suddenly, or where weather and vegetation can impact visibility. See the Anderson
         Declaration documenting that these potential safety hazards are common on Guam.

26

27       [8] Mr. Parker states that SWANA has 8,000 members.

1    ECF No. 1686 at 2.

2           Based on my experience, the majority of residential and commercial
     collection trucks manufactured today have the cab forward design because it

3    represents the industry standard for safety in solid waste management. Consequently,
     there are many manufacturers of collection trucks with cab forward design.
     *Elimination of the cab forward design requirement is inconsistent with the industry's*

4    *standard for safety in solid waste management.*

5    *Id.* at ¶¶6-7 (emphasis added)

6           Based on the information presented before the court, the court finds that cab forward

7    collection trucks would provide GSWA workers with a safer working environment than conventional

8    cab trucks and that such a specification would not unduly restrict competition under Guam's

9    Procurement Law. The court is mindful of the deplorable and unsanitary working conditions that

10   existed for GSWA employees at the start of the Receivership. *See* Order re Cash Payments (Feb. 13,

11   2009) at 6-7, ECF No. 359. Almost all of the government-owned equipment was in a severe state

12   of disrepair,[9] with most of it inoperable due to a lack of parts and maintenance, resulting in excessive

13   use of rental equipment at an extraordinarily high cost.[10] With the assistance of the emergency

14   declaration by then-Governor Felix P. Camacho, the Receiver was able to expedite the procurement

15   of equipment and improve conditions for the employees. The court shares the Receiver's desire to

16   ensure the safety of GSWA employees and the public that they serve. As Mr. Anderson notes,

17   "competition to acquire the lowest cost safe vehicle is GSWA's goal and it should not be relegated

18   to a less safe vehicle in order to achieve a savings at the expense of the safety of its crew and the

19   public." Decl. R. Chace Anderson at ¶9, ECF No. 1686.

20          Additionally, because the procurement of these collection trucks has been delayed,[11] the

21

22          [9] During one of its site visits, the court observed that the original seat was removed from one

23   garbage collection truck and replaced with an unsecured seat for the driver, which certainly posed
     a safety hazard. *See* Receiver's Quarterly Report (July 10, 2008) at Slide 19, ECF No. 250-2.

24
            [10] The cost of rental equipment averaged about $11,000 per day or over $4 million annually.
25   *Id.* at 8.

26          [11] The original IFB was issued in September 2014. GSWA appealed the OPA's Decision

27   on March 6, 2015. Although trial in the Superior Court of Guam was originally scheduled for
     January 2016, it was continued twice to accommodate the parties' schedules and was delayed further

United States of America v. Government of Guam, Civil Case No. 02-00022    page 8 of 11
Order re Motion for Clarification

1  Receiver states that this puts at risk the quality of service to its residential customers, the revenue

2  needed to operate GSWA , and the ability of GSWA to achieve compliance with the Consent Decree.

3  *See* Receiver's Reply Brief at 1, ECF No. 1707. Despite Morrico's arguments to the contrary, the

4  court agrees that GSWA's ability to comply with the Consent Decree will be impacted by the further

5  delay in the procurement of these refuse collection trucks.

6       The Consent Decree required the Government of Guam to submit a post-closure care and

7  monitoring plan. *See* Consent Decree at ¶8(b)(i), ECF No. 55. Pursuant to U.S. EPA regulations,[12]

8  GSWA is required to continue monitoring and maintaining the landfill for a 30-year period to

9  protect against the release of hazardous constituents to the environment. The Receiver estimates that

10  the net present value of the total 30-year monitoring cost is $15,670,893.97.[13] *See* Quarterly Report

11  (Oct. 21, 2015) at 48, ECF No. 1634-1. Under the financing plan approved by the court, all

12  commercial haulers on Guam will be ordered to make their payments through a court-appointed

13  trustee, and, upon receipt of said funds, the trustee will deduct approximately $374,758.08 per month

14  to fund the Ordot Dump Post-Closure Reserve and pass the balance through to GSWA for

15  operations. *See* Order (May 2, 2016) at 10, ECF No. 1668. These monthly set asides by the trustee

16  into the Ordot Dump Post-Closure Reserve would continue until the reserve was fully funded, which

17  was anticipated to occur in FY2023. While this financial plan encompasses the use of income

18  generated from large commercial accounts only, the viability of such a plan *presumes* that GSWA

19  revenue from residential customers remains stable. To produce the revenue necessary to assure that

20

21  _____

22  because the Public Auditor failed to submit a complete administrative record to the court. Decl. R.
    Chace Anderson at ¶¶12-14, ECF No. 1686.

23       [12] *See* Title 40, Code of Federal Regulations, Part 258, Subpart F - Closure and Post-Closure
24  Care.

25       [13] This estimate does not include the compensation of the trustee the Receiver proposes the
    court appoint when the Receivership ends to manage the funds in the Ordot Dump Post-Closure Care
26  Reserve. Additionally, the estimate does not include the compensation for the independent engineer
    the trustee will have to retain to inspect and certify that the post-closure care operator is performing
27  all of the work necessary for the proper care of the environmental closure of the Ordot Dump.

United States of America v. Government of Guam, Civil Case No. 02-00022  
Order re Motion for Clarification

page 9 of 11

1   funding for all Consent Decree projects materializes, GSWA must ensure that all its financial

2   resources, including revenue from residential customers, remains secure. As the Receiver notes,

> When service is poor, many residential and commercial customers stop paying their bills.[14] This was the condition that existed when the Receivership began. ... Most of these problems were created by the terrible condition of the residential fleet of trash trucks. Allowing this problem to occur again would put more than a third of GSWA's revenue at risk. As it did before, old equipment in need of more and more maintenance work will destabilize all of GSWA's revenue since GSWA would have to rapidly spend down its reserves creating an inability for GSWA to pay all of its bills.

8   Receiver's Reply Brief at 5, ECF No. 1707.

9       Over the almost nine years this receivership has been in place, the court and the Receiver

10   have worked diligently with the parties to ensure that compliance with the Consent Decree would

11   not cripple the Government of Guam financially. The current financing plan approved by the court

12   to pay for the remaining Consent Decree projects will not detrimentally affect the Government of

13   Guam's ability to meet its other financial obligations. The court will not risk the viability of the

14   current financing plan and interrupt the funding required to achieve full compliance with the Consent

15   Decree by allowing residential services to fall apart again by allowing the fleet of collection trucks

16   to deteriorate. As stated by Mr. Anderson, GSWA "can no longer wait to procure these trucks."

17   Decl. R. Chace Anderson at ¶17, ECF No. 1686. He further stated that "GSWA's current fleet is

18   well past its useful life expectancy" and that maintenance costs for the fleet has increased from

19   $405,480.50 in FY2014 to $738,766.34 in FY2016. The urgency to replace GSWA's fleet of

20   collection trucks is also supported by Mr. Parker's Declaration, which states:

> In corrosive salt environments such as on Guam, collection trucks may need to be replaced at a greater frequence than in other areas. Typically, collection trucks have a published lifespan of 5-7 years. Trucks on Guam, however, are likely to have a shorter lifespan due to the corrosive environment.
> According to the Receiver, GSWA's collection trucks have an expected lifespan of about 5 years. Several of GSWA's trucks are 12 years old. These trucks are at the end of or past the typical lifespan in a non-corrosive environment, and may be well past the typical lifespan in Guam's corrosive environment. A further delay in procurement is inconsistent with standard safety practices, given that GSWA's entire fleet of collection trucks may be well past its prime.

---

[14] The court recalls that approximately 4,000 customers were receiving service for free.

1    Declaration of Thomas D. Parker at ¶¶8-9, ECF No. 1697 (internal citation omitted).

2           The court is unpersuaded by Morrico's argument that the Receiver's exercise of the authority
3    granted to it under the Appointment Order violates 28 U.S.C. § 959(b). The court intended for the
4    Receiver to exercise the authority granted to it in a manner consistent with Guam laws, but the court
5    recognized that conformity with local law may not always be possible. For the reasons discussed
6    above, this is one of those instances, and compliance with the Consent Decree necessitates such a
7    finding. Based on the timeline previously approved by the court, the receivership will end by
8    December 2017. Delaying the procurement of these refuse trucks will have an impact on GSWA's
9    resources to complete the Consent Decree projects on the timeline previously approved by the court
10   and may further affect the timeline for GSWA's transition from Receivership to GSWA Board
11   control, which the court is not prepared to extend at this time. Accordingly, the court approves the
12   Receiver's exercise of authority in issuing IFB GSWA-002-017, as contemplated under the court's
13   Appointment Order, without the pre-approval of this court.

14                                          **CONCLUSION**

15          In light of the above discussion, the court hereby concludes that the cab forward specification
16   is critical to the safety needs of GSWA and the public and that GSWA can no longer wait to procure
17   these trucks. Accordingly, the court approves the Receiver's exercise of authority in issuing IFB
18   GSWA-002-017. However, in light of the concerns raised by the OPA Decision and the Superior
19   Court of Guam's Findings of Fact and Conclusions of Law,[15] the court orders the Receiver to issue

20

21          [15] When the OPA and the Superior Court of Guam concluded that the cab forward
22   specification unnecessarily restricted competition in violation of Guam law, this conclusion was
     based on their finding that the "procurement record include[d] no papers or material used by GSWA
23   in the development of the IFB specifications." OPA Decision (Feb. 20, 2015) at 9, Ex. 1 to ECF
24   No. 1694. *See also* Findings of Fact and Conclusions of Law at 8, *GSWA v. Brooks*, Superior Court
     of Guam Civil Case No. CV0185-15, attached as Ex. B to ECF No. 1706. The Public Auditor stated
25   that without this information, she "cannot review GSWA's justification in requiring only the cab
     forward specification in the IFB." OPA Decision (Feb. 20, 2015) at 10, Ex. 1 to ECF No. 1694.
26   What is troubling, however, is that rather than directing GSWA to amend the IFB to include the
     documentation that would support the inclusion of the cab forward specification by the Receiver, the
27   Public Auditor ordered GSWA to accept a truck design that is not the industry standard.

1    a new invitation for bid for the cab forward refuse collection trucks and include in the procurement

2    record all papers and materials used by GSWA to develop the cab forward specification, including

3    a copy of this Order and Mr. Parker's Declaration.

4         IT IS SO ORDERED.



     /s/ Frances M. Tydingco-Gatewood
          Chief Judge
     Dated: Jan 27, 2017

**EXHIBIT B**

**ECF No. 239 Order Re: Appointment of Receiver, pp. 1, 15 and 16**

**(March 17, 2008)**

1
2
3
4
5
6                        IN THE DISTRICT COURT OF GUAM
7
8   UNITED STATES OF AMERICA,          )        CIVIL CASE NO. 02-00022
9                                      )
        Plaintiff,                     )
10                                     )
        v.                             )
11                                     )        ORDER RE: APPOINTMENT OF RECEIVER
12  GOVERNMENT OF GUAM,                )
                                       )
13      Defendant.                     )
14  _____)

15          In the four years since the Consent Decree was entered, which includes the court meeting

16  with the parties and conducting site visits for the last several months, the following observations

17  have become increasingly clear: (1) there has been an historical and present lack of commitment

18  by the island's leaders in addressing this solid waste crisis, (2) the present Governor is committed

19  to coming into compliance with the Consent Decree, and (3) despite the Governor's bests efforts

20  and those of the employees of the Department of Public Works ("DPW"), they alone cannot

21  solve this problem without a concerted effort by all sectors of the Government of Guam.  The

22  problem of a highly dysfunctional, largely mismanaged, overly bureaucratic, and politically

23  charged solid waste system, which this Governor has inherited from past administrations, is

24  beyond correction by conventional methods.  Accordingly, this court invokes its equity

25  jurisdiction and Rule 70 of the Federal Rules of Civil Procedure and hereby appoints a receiver

26  to manage, supervise and oversee the Solid Waste Management Division ("SWM") of DPW.

27  ///

28  ///

1  recognizes the level of commitment shown by Governor Felix P. Camacho and appreciates the
2  hard work and limited progress of DPW in the last few months, the Government of Guam lacks
3  the resources, experienced personnel, and necessary support to comply with the Consent Decree
4  on its own.  Governor Camacho expressed his frustration when he compared the Government of
5  Guam to a rocking horse: "There is much motion, but no progress."  The court concurs with the
6  Governor's characterization of the situation, but cannot accept the lack of forward movement.

7      Accordingly, the court hereby appoints as Receiver Gershman, Brickner & Bratton, Inc.
8  ("GBB") of Fairfax, Virginia, a solid waste management consulting firm included in the
9  Government of Guam's list of potential receivers.  This appointment is, without a doubt, one of
10  the most monumental decisions this court has ever made.  It is not made lightly or with relish.
11  Rather, this decision was reached after much deliberation and upon consideration of the complete
12  record in this case.

13      Therefore, having conducted monthly hearings and site visits in the above-entitled matter
14  to determine the progress made toward complying with the Consent Decree; having considered
15  all the submissions heretofore filed by the parties; in light of the Government of Guam's lengthy
16  history in failing to comply with the Consent Decree and violating the Clean Water Act, 33
17  U.S.C. § 1251, *et seq.*; and because of the failure of less drastic remedies to secure compliance
18  with the Clean Water Act:

19      **IT IS HEREBY ORDERED** that under the broad range of equitable powers available to this
20  court to enforce and effectuate its orders and judgment and Rule 70 of the Federal Rules of Civil
21  Procedure, GBB, acting by and through its Special Principal Associate David L. Manning, is
22  appointed as the Receiver and is vested with the power and authority provided under Rule 70 to
23  perform all acts it deems necessary to achieve expeditious compliance with the Consent Decree.

24  A.   **RECEIVER'S AUTHORITY/DUTIES**

25      1.  **IT IS ORDERED** that the Receiver shall have full power and authority to enforce the
26  terms of the Consent Decree, and assume all of the responsibilities, functions, duties, powers and
27  authority of the Solid Waste Management Division of the Department of Public Works, and any
28  and all departments, or other divisions of the Department of Public Works insofar as they affect

15

1  the Government of Guam's compliance with the Consent Decree.

2  2. **IT IS FURTHER ORDERED** that the Receiver shall have the authority required or

3  necessary for the complete management and control of the Consent Decree projects, including

4  but not limited to:

5       (a) The supervision of all of Government of Guam's employees associated

6  with the Consent Decree projects;

7       (b) The performance of existing contracts;

8       (c) The entering into future contracts deemed necessary. In awarding any

9
10  future contracts, the Receiver shall follow the procedures required in Guam's

11  statutes and regulations, unless, in the best judgment of the Receiver, such

12  compliance would unreasonably delay the progress in meeting the mandates of the

13  Consent Decree;

14       (d) The hiring of all such consultants, professionals, contractors,

15  engineering firms or counsel which the Receiver deems necessary for the

16  performance of administrative, financial advisory, legal, accounting, engineering,

17  construction, and operations services;

18       (e) The facilitation of financing and/or borrowing of such funds necessary

19  to carry out the duties relating to the Consent Decree as set forth in the

20  Government of Guam's Revised Financial Plan. If, in the best judgment of the

21  Receiver, the Revised Financial Plan fails to provide the means or methods of

22  financing necessary or would unreasonably delay the progress in meeting the

23  mandates of the Consent Decree, the Receiver is authorized to modify the Plan to

24  provide for alternative means or methods of debt financing it deems appropriate;

25       (f) The application to the Consolidated Commission on Utilities for rate increases

26  for residential waste collection services and/or tipping fees on a temporary or permanent

27  basis, as appropriate, unless, in the best judgment of the Receiver, such action would

28  unreasonably delay the progress in meeting the mandates of the Consent Decree;

16

**EXHIBIT C**

**ECF No. 1668 Order re Revised Transition Timeline for the Termination of the Federal Receivership and Financing Plan for the Post-Closure Care of the Ordot Dump, pp. 1-4, 6-7, 9-10 and 16**

**(May 2, 2016)**

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>GOVERNMENT OF GUAM,<br><br>        Defendant. | CIVIL CASE NO. 02-00022<br><br>**ORDER**<br>re Revised Transition Timeline for the<br>Termination of the Federal Receivership<br>and Financing Plan for the<br>Post-Closure Care of Ordot Dump |

This matter came before the court on March 29, 2016, for a hearing on the proposals submitted by the Receiver and the Government of Guam with regard to a revised transition timeline and a funding plan for the post-closure care of the Ordot Dump. Having considered the proposals and pertinent pleadings[1] and having heard argument from the parties, the court issues the following Order.

---

[1] The pertinent pleadings comprise of the following:
- Receiver's October 21, 2015 Quarterly Report, ECF No. 1634-1,
- Government of Guam and the Guam Solid Waste Authority Board's Response to Receiver's Oct. 21, 2015 Report (the "Government of Guam Alternative Plan") and attachments, ECF No. 1648,
- United States' Response to Government of Guam's Proposed Timeline and Financial Plan and attachment, ECF No. 1651,
- Receiver's Response to Government of Guam's Response to Receiver's Oct. 21, 2015 Report, ECF No. 1652,
- Government of Guam's Reply to Receiver's Response, ECF No. 1654,
- Declaration of Simon Sanchez II, ECF No. 1655,
- United States' Sur-Reply to Government of Guam's Reply, ECF No. 1661, and
- Receiver's Sur-Reply to Government of Guam's Reply, ECF No. 1662.

United States of America v. Government of Guam, Civil Case No. 02-00022                    page 2 of 16
Order re Revised Transition Time for the Termination of the Federal Receivership and Financing Plan for the Post-Closure Care of Ordot Dump

## BACKGROUND[2]

On February 11, 2004, the court approved the Consent Decree entered into by the parties. *See* Consent Decree, ECF No. 55. Among other things, the Consent Decree established a schedule for the closure of the Ordot Dump and the construction and operation of a new conforming municipal solid waste landfill. *Id.* at ¶¶8-9. The Consent Decree mandated operations at the new landfill to begin by September 23, 2007, with operations at the Ordot Dump to cease by October 23, 2007. *Id.* at ¶¶8(i) and 9(i).[3] Additionally, as part of the closure of the Ordot Dump, the Consent Decree required the Government of Guam to submit a post-closure care and monitoring plan. *Id.* at ¶8(b)(i).

The Government of Guam acknowledged in the Consent Decree that "the total amount of funding needed to complete the projects required under [the] Consent Decree [was] not currently available." *Id.* at ¶10(a). The Consent Decree thus required the Government of Guam, within 120 days after its entry, to submit a financial plan which identified "the funding source or sources and a schedule to secure funds for the capital and operating costs necessary" to pay for the various compliance measures required under the Consent Decree.[4] *Id.* The Government of Guam agreed to "use its best efforts to obtain sufficient funding to fully implement the projects required by [the] Consent Decree." *Id.*

The Government of Guam failed to meet critical Consent Decree deadlines and failed to raise the financial resources necessary to complete the Consent Decree projects. Thus, on January 31, 2007, the United States moved to enforce the Consent Decree. *See* ECF Nos. 68-69. After conducting numerous monthly status hearings and site visits and based on the lack of progress

---

[2] Because the parties are familiar with the facts and procedural history of this action, the court will not recite them here in great detail except as necessary to explain its decision.

[3] The Government of Guam did not meet these deadlines. Instead, under the Receivership, the Ordot Dump stopped receiving trash for disposal on August 31, 2011, and the new landfill in Layon was promptly opened the next day. *See* Minutes (Sept. 1, 2011), ECF Nos. 795-96.

[4] The Government of Guam submitted its financial plan in June 2004 as required, and, after receiving the U.S. EPA's comments, revised its financial plan and resubmitted it in October 2004. *See* Machol Decl. at ¶3, ECF No. 74.

1    by the Government of Guam, the court appointed a Receiver[5] with "full power and authority to

2    enforce the terms of the Consent Decree, and assume all of the responsibilities, functions, duties,

3    powers and authority of the Solid Waste Management Division of the Department of Public Works,

4    and any and all departments, or other divisions of the Department of Public Works[6] insofar as they

5    affect the Government of Guam's compliance with the Consent Decree." Order Re: Appointment

6    of Receiver (Mar. 17, 2008) at 15-16, ECF No. 239.

7         The Receiver initially estimated the capital needed to achieve compliance with the Consent

8    Decree would be approximately $159.7 million, of which approximately $40 million would be

9    required for the closure of the Ordot Dump. See Quarterly Report (Oct. 22, 2008) at 13, ECF

10   No. 269-1. The Quarterly Report cautioned that the estimates were "subject to change as the

11   competitive bidding process provide[d] the final measure of the cost for [the Consent Decree]

12   projects." ECF No. 269-1 at 13. The Receiver further stated that the "estimates related to the Ordot

13   Dump's closure" would "require a full reexamination" as the time for the project to actually begin

14   drew near because there was "a significant amount of remedial investigation that remain[ed] to be

15   accomplished . . . to determine the extent of environmental damage that ha[d] occurred [at the Ordot

16   Dump] and devise acceptable plans to mitigate the damage identified." Id. at 14.

17        The Receiver also identified various financing options for the Government of Guam's

18   consideration for funding the Consent Decree projects. Id. at 15-20. The Receiver recommended

19   to the Government of Guam that the Consent Decree projects be funded through a revenue bond

20   guaranteed by Section 30 funds received by the Government of Guam. Id. at 21. The Government

21

22        [5] For a more thorough recitation of the background of this case, including the events that led
     to the appointment of a Receiver, the court incorporates by reference the following prior decisions:
23   Order re Appointment of Receiver, ECF No. 239; Order re Motion for Reconsideration, ECF
     No. 1157; Order re Motion to Intervene, ECF No. 1164; Order re Emergency Motion for a Stay
24   Pending Appellate Review, ECF No. 1230; and Order re Motion to Stay and for Further Relief, ECF
25   No. 1243.

26        [6] Upon enactment of Guam Public Law 31-020, the Solid Waste Management Division
     ("SWMD") became the Guam Solid Waste Authority ("GSWA"), an autonomous, public corporation
27   of the Government of Guam. 10 GUAM CODE ANN. § 51A103. The court thereafter vested the
     Receiver with "full power and authority over GSWA, to the full extent of its previously granted
28   authority over SWMD." Order (Sept. 2, 2011) at 9, ECF No. 798.

United States of America v. Government of Guam, Civil Case No. 02-00022                                    page 4 of 16
Order re Revised Transition Time for the Termination of the Federal Receivership and Financing Plan for the Post-Closure Care of Ordot Dump

1 of Guam, however, opted to finance the Consent Decree projects through the sale of approximately

2 $202.4 million in Limited Obligation Bonds, which pledged Section 30 funds as the source of

3 repayment. *See* ECF No. 455 at 3. Of this amount, approximately $139.7 million[7] was allocated for

4 deposit to the Project Construction Fund. *See* ECF No. 455-1 at 16.

5       The cost for the Ordot Dump closure increased from the Receiver's original 2008 estimates,

6 and on May 21, 2013, the Receiver informed the court and the parties that "it is likely that there will

7 not be enough money from the [Limited Obligation] Bonds to cover all of the projects" related to

8 the Consent Decree. *See* Quarterly Report (May 21, 2013) at 33, ECF No. 1067-1. These unfunded

9 projects included: (1) upgrades to the residential transfer stations,[8] (2) Route 4 safety enhancements,

10 (3) upgrades to Dero Road and (4) post-closure care for the Ordot Dump. The court directed the

11 Receiver and the Government of Guam to meet and discuss the development of a plan for additional

12 financing or funding to pay for the unfunded projects. The Receiver and the Government of Guam

13 could not agree on whether all the additional projects were required under the Consent Decree, and

14 if required, how to finance these projects.

15       Ultimately, after briefing and hearings, the court issued separate orders as to each of the

16 unfunded projects. With regard to the upgrades to the residential transfer stations, the court found

17 that although the upgrades to the residential transfer stations were not specifically required in the

18 Consent Decree, the project became a mandatory requirement of the Consent Decree once GEPA

19 required that the facilities be permitted as a condition of the Solid Waste Facility Permit for the

20

21

22       [7] The Government of Guam deposited an initial amount of $20 million – obtained through

23 a loan with the Bank of Guam – with a trustee designated by the Receiver and approved by the court.

24       [8] When the Layon Landfill began operating as Guam's new conforming municipal solid

25 waste landfill, the Guam Environmental Protection Agency ("GEPA") required, as a condition to the
permitting of the Layon Landfill, that the Receiver permit the residential transfer stations. The

26 upgrades to these facilities were not included in the Receiver's initial estimates in 2008 since
GEPA's requirement to permit each transfer station only materialized in 2011. Additionally, when

27 GEPA renewed the Layon Landfill's permit on January 28, 2015, Special Condition II required
GSWA to "obtain a permit to operate transfer stations that meets Guam's regulatory agencies

28 requirements."

<u>United States of America v. Government of Guam</u>, Civil Case No. 02-00022                              page 6 of 16
Order re Revised Transition Time for the Termination of the Federal Receivership and Financing Plan for the Post-Closure Care of Ordot Dump

1   Receiver to develop a financing plan that included a dedicated funding mechanism which secured

2   the funds necessary to fully implement all post-closure care and monitoring actions. *Id.* at 10.

3          In compliance with the court's orders, the Receiver's most recent Quarterly Report included

4   a revised transition timeline and a plan for financing the post-closure care of the Ordot Dump that

5   included a dedicated funding mechanism. *See* Quarterly Report (Oct. 21, 2015) at 49, ECF

6   No. 1634-1. The court allowed the Government of Guam to submit its own proposed alternative

7   financial plan and transition timeline and also gave the parties an opportunity to comment on each

8   of the proposals. *See* Order (Oct. 26, 2015) at 7-8, ECF No. 1635.

9                                                    **DISCUSSION**

10      <u>Transition Timeline</u>

11         On July 1, 2013, the court formally adopted the Receiver's  proposed timeline for GSWA's

12  transition from Receivership to GSWA Board control.[12]  *See* Order re Transition from Court-

13  Appointed Receiver to the GSWA Board at 1, ECF No. 1132. Under said Transition Timeline, the

14  Receivership was expected to end five months ago in December 2015, with the environmental

15  closure of the Ordot Dump.[13]  However, the Transition Timeline had to be amended because the

16  court ordered the Receiver to complete the upgrades and permitting of the residential transfer stations

17  and the Dero Road project.

18         The Receiver estimates it will need approximately $9,442,900 for the additional projects,

19  and, taking into account various factors, the Receiver anticipates two dry seasons will be needed to

20

21         [12]  This timeline shall hereinafter be referred to as the "Transition Timeline."

22         [13]  The law that established the GSWA as an autonomous public corporation also created a
    Board of Directors for GSWA (the "GSWA Board"). Although the GSWA Board sought an earlier
23  transition, the court has stressed that the Receiver will "retain full administrative and operational
    control over GSWA to assure that the resources needed to achieve full compliance with the Consent
24  Decree are provided." Order (July 3, 2014) at 5, ECF No. 1378. *See also* Order (July 1, 2013) at 2,
    ECF No. 1132 ("While the court is encouraged that the Board wishes to be actively involved in
25  discussions and decisions concerning Ordot Dump and the Layon Landfill, the fact remains that
    matters concerning both the Dump and Landfill remain Consent Decree project matters, under the
26  purview of the Receiver, by order this court. . . . [T]he Receiver has, and will retain, the same
    authority and control over such areas until such time as the court orders otherwise. In other words,
27  complete turnover of control and authority of [GSWA], when the time is right, will occur at a date
28  ordered by this court.")

1  complete this work.[14] *See* Quarterly Report (Oct. 21, 2015) at 53-54, ECF No. 1634-1. Given the

2  remaining work it must accomplish, the Receiver's revised transition timeline anticipates an end to

3  the receivership in December 2017, with the hiring process for a general manager and comptroller

4  to begin in January 2017. *Id.* at 54, Fig. 42. With regard to transitioning the temporary contract

5  employees to permanent positions, the Receiver states this conversion "will cause a significant

6  increase in GSWA's cost,[15] [thus] it should be carefully planned out but not actually executed until

7  near the end of the transition period." *Id.* at 54.

8         Not surprisingly, the Government of Guam envisions an earlier transition period. The

9  Government of Guam proposes "that a Management Team consisting of a [General Manager] and

10  Comptroller be hired and commence working with the Receiver as early as October 2016."

11  Government of Guam Alternative Plan at 3, ECF No. 1648. The Government of Guam believes that

12  a full transition from Receivership to GSWA Board control could occur as early as March 2017,

13  which is only about ten months from now.[16]

14         Regarding the conversion of temporary positions at GSWA to permanent positions, the

15  Government of Guam states that the "GSWA Board has not yet determined whether any or all [of

16  the] unclassified/contract GSWA employees will be transitioned into government of Guam's merit

17  system." *Id.* at 5. With the assistance of the Department of Administration, the Government of

18  Guam anticipates "it would take approximately six (6) months to identify critically needed positions,

19  advertise, have contract employees compete and to select qualified applicants." *Id.* at 6. The

20

21         [14] The Receiver states the additional projects will be completed over calendar years 2016 and
2017.

22

23         [15] The Receiver estimates the cost of converting the contract employees to permanent
employees will result in a 35.5% increase to GSWA. *See* Receiver's Sur-Reply at 7, ECF No. 1662.

24         [16] In their alternative proposal, the Government of Guam states it

25  agree[s] with the Receiver's original proposal pursuant to the . . . Transition Timeline
that there should be at least a six (6) month transition overlap. Assuming the [c]ourt
26  permits the GSWA Board to hire a Management Team, the GSWA Board would like
27  to complete the transition within six (6) months after new management is hired.

28  *Id.*

United States of America v. Government of Guam, Civil Case No. 02-00022          page 9 of 16
Order re Revised Transition Time for the Termination of the Federal Receivership and Financing Plan for the Post-Closure Care of Ordot Dump

1   calculations presented to the court reveal otherwise. As noted by the Receiver, operating expenses

2   for GSWA will actually increase after the Receivership ends. *See* Ex. 1 and 2 to Receiver's Sur-

3   Reply at 16-17, ECF No. 1662. The Receiver estimates that the new management positions and the

4   conversion of the contract employees to permanent positions under the merit system will result in

5   an increase of over $122,248 to GSWA's operating cost. *See* Table 2 to Receiver's Sur-Reply at

6   8, ECF No. 1662. Thus, the Receiver's proposal will conserve necessary funds by deferring these

7   transition-related expenditures.

8      Financing Plan

9      The Ordot Dump has been environmentally closed. *See* Minutes (Mar. 28, 2016), ECF

10   No. 1665. Nevertheless, pursuant to U.S. EPA regulations,[18] GSWA is required to continue

11   monitoring and maintaining the landfill for a 30-year period to protect against the release of

12   hazardous constituents to the environment. Specific post-closure care requirements consist of

13   maintaining the integrity and effectiveness of the final cover system, the leachate collection system,

14   the groundwater monitoring system, and the methane gas monitoring system. 40 C.F.R. § 258.61(a).

15      Landfill closures are complex, costly, and unique civil engineering projects that leave
     waste in place and that necessitate post-closure monitoring and maintenance well into
16      the future to ensure the continued protection of public health and the environment.
     Solid waste takes decades to centuries to decompose, and the resulting settlement
17      from decomposing waste affects cover and drainage systems, and the generation of
     landfill gas and leachate. .... Old dumpsites with historic non-compliant operations,
18      such as the Ordot Dump, are more technically challenging during post-closure care
     because they lacked proper environmental monitoring and controls during operations.
19      Later problems can occur with extreme events, such as typhoons or earthquakes.
     Ordot's unique design of vegetated exposed geomembrane on side slopes and
20      impacts from the tropical environment will be especially crucial to evaluate and
     monitor during the post-closure period.

21

22   Walker Decl. at ¶4, ECF No. 1651-1.

23      The Receiver estimates that the net present value of the total 30-year cost is $15,670,893.97.[19]

24    ——————————

25      [18] *See* Title 40, Code of Federal Regulations, Part 258, Subpart F - Closure and Post-Closure
    Care.

26

27      [19] This estimate does not include the compensation of the trustee the Receiver proposes the
    court appoint when the Receivership ends to manage the funds in the Ordot Dump Post-Closure Care
    Reserve. Additionally, the estimate does not include the compensation for the independent engineer
28     the trustee will have to retain to inspect and certify that the post-closure care operator is performing

1    *See* Quarterly Report (Oct. 21, 2015) at 48, ECF No. 1634-1. Because the balance in the special

2    account was insufficient to fund the additional Consent Decree-related projects and the post-closure

3    care costs, the court ordered the Receiver to prepare a financial plan that includes a dedicated

4    funding mechanism to secure funds necessary to fully implement all post-closure care and

5    monitoring actions.

6         Under the Receiver's financial plan, beginning in fiscal year ("FY") 2016 through

7    approximately FY2023, the Receiver recommends setting aside $2 million annually and depositing

8    said funds into the Ordot Dump Post-Closure Reserve. These funds would come from the

9    approximately $4.5 million in annual revenue that was previously used to reimburse the Government

10   of Guam for debt service. In FY2016 and 2017, the Receiver would be responsible for depositing

11   said funds into the Ordot Dump Post-Closure Reserve, for a total of $4 million during the remaining

12   Receivership period. *See* Quarterly Report (Oct. 21, 2015) at 49-50, ECF No. 1634-1. To assure

13   the needed funds are set aside and remain available post-Receivership, the Receiver recommends

14   that the court appoint a trustee when the Receivership ends to manage the funds in the Ordot Dump

15   Post-Closure Reserve. *Id.* at 50. The Receiver also proposes that the court order all commercial

16   haulers on Guam to make their payments through the trustee, and, upon receipt of said funds, the

17   trustee will deduct what is needed to fully fund the Ordot Dump Post-Closure Reserve[20] and pass

18   the balance through to GSWA for operations. The trustee will continue these monthly set asides into

19   the Ordot Dump Post-Closure Reserve until the reserve is fully funded, which is anticipated to occur

20   in FY2023. *Id.* at Table 17.

21        The Receiver's proposed financing plan takes into account other capital needs of GSWA.

22   These include equipment needs and other projects, such as the closure of Cells 1 and 2 at Layon and

23   the opening of a new cell. *Id.* at 48.[21] The Receiver asserts that although "[t]hese projects may occur

24   _____

25   all of the work necessary for the proper care of the environmental closure of the Ordot Dump.

26        [20] The Receiver recommends this amount not exceed $374,758.08 per month. *See* Quarterly
     Report (Oct. 21, 2015) at 51, Fig. 41, ECF No. 1634-1.

27

28        [21] The Receiver estimates that the construction of a new cell at the Layon Landfill will cost
     $10,590,642.09 and the closure cost for Cells 1 and 2 are estimated to be $5,273,975.41, for a

United States of America v. Government of Guam, Civil Case No. 02-00022                                    page 16 of 16
Order re Revised Transition Time for the Termination of the Federal Receivership and Financing Plan for the Post-Closure Care of Ordot Dump

1    financial insurance mechanism."

2            The court at this time adopts the Receiver's revised transition timeline and proposed financial

3    plan.[27]  Barring any unforeseen circumstances, the federal Receivership under the leadership of

4    Gershman, Brickner & Bratton, Inc. will end in 2017.  While the GSWA Board is eager to begin

5    overseeing the operations of the Layon Landfill and the post-closure care of the Ordot Dump, much

6    technical work remains and it is essential that the Receiver has uninterrupted control over all aspects

7    of GSWA's operations and finances to ensure the timely completion of these projects.  Accordingly,

8    the parties and their departments and agencies are ordered to continue to cooperate with the

9    Receiver's efforts to responsibly and expeditiously complete all Consent Decree-related projects.

10           IT IS SO ORDERED.

11



12                                              /s/ Frances M. Tydingco-Gatewood
                                                    Chief Judge
13                                              Dated: May 02, 2016

14

15

16

17

18

19

20

21

22

23

24

25

26

27        [27]  The adoption of the Receiver's proposal in no way prevents the Government of Guam
          from refinancing the 2009 Section 30 bonds if the Government of Guam and its financial advisers
28        believes it is in the best interest to do so.

**EXHIBIT D**

**ECF No. 1687-13 Bank of Guam Reserve for Unfunded Expenses**

**(November 7, 2016)**

**Bank of Guam Reserve for Unfunded Expenses**

4/1/2016 through 6/30/2016

| Date | Account | Description | Memo | Category | Amount |
|---|---|---|---|---|---|
| BALANCE 3/31/2016 | | | | | $8,473,347.33 |
| 4/6/2016 | Reserve for Unfunded Expenses | Reserve For Unfunded Expense Monthly Deposit | | [System Surplus Account] | $ 374,758.08 |
| 4/29/2016 | Reserve for Unfunded Expenses | Interest Earned | Bank of Guam Interest | Interest Inc | $ 902.62 |
| 5/3/2016 | Reserve for Unfunded Expenses | Guam Power Authority | Electric bill for Ordot Operation | Bills & Utilities:Utilities | $ (1,448.03) |
| 5/3/2016 | Reserve for Unfunded Expenses | Bank Of Guam | Fee for cashier's check R-2016-002 | Bank Service Charge | $ (12.50) |
| 5/5/2016 | Reserve for Unfunded Expenses | Guam Power Authority | Electric bill for Ordot Dump Operation | Bills & Utilities:Utilities | $ (959.78) |
| 5/5/2016 | Reserve for Unfunded Expenses | Bank Of Guam | Fee for cashier's check R-2016-002 | Bank Service Charge | $ (12.50) |
| 5/10/2016 | Reserve for Unfunded Expenses | Reserve For Unfunded Expense Monthly Deposit | | [System Surplus Account] | $ 374,758.08 |
| 5/31/2016 | Reserve for Unfunded Expenses | Interest Earned | Bank of Guam Interest | Interest Inc | $ 967.43 |
| 6/9/2016 | Reserve for Unfunded Expenses | Reserve For Unfunded Expense Monthly Deposit | | [System Surplus Account] | $ 374,758.08 |
| 6/27/2016 | Reserve for Unfunded Expenses | Guam Waterworks Authority | Bank error - paid on wrong account | Bills & Utilities:Utilities | $ (10,875.93) |
| 6/27/2016 | Reserve for Unfunded Expenses | Guam Waterworks Authority | Leachate treatment for Ordot Dump | Bills & Utilities:Utilities | $ (21,036.55) |
| 6/27/2016 | Reserve for Unfunded Expenses | Bank Of Guam | Fee for cashier's check R-2016-004 | Bank Service Charge | $ (12.50) |
| 6/28/2016 | Reserve for Unfunded Expenses | Guam Waterworks Authority | Bank error - paid on wrong account | Bills & Utilities:Utilities | $ 10,875.93 |
| 6/30/2016 | Reserve for Unfunded Expenses | Interest Earned | Bank of Guam Interest | Interest Inc | $ 975.39 |
| 4/1/2016 - 6/30/2016 | | | | | $1,103,637.82 |

| | |
|---|---|
| BALANCE 6/30/2016 | $9,576,985.15 |
| TOTAL INFLOWS | $1,137,995.61 |
| TOTAL OUTFLOWS | $ (34,357.79) |
| NET TOTAL | $1,103,637.82 |

**EXHIBIT E**

**ECF No. 1634-1 Quarterly Report of the Receiver, pp. 1, 38, 41, 45 and 49**

**(October 21, 2015)**

# Quarterly Report of the Receiver

## Civil Case No. 02-00022
## United States of America v. Government of Guam
## Guam Solid Waste Authority

Prepared for:



## U.S. District Court of Guam

Submitted by:



**SOLID WASTE**
**MANAGEMENT**
**CONSULTANTS**
**RECEIVER**

Gershman, Brickner & Bratton, Inc.
8550 Arlington Blvd, Suite 304
Fairfax, Virginia 22031

## October 21, 2015

Printed on recycled paper

handled pursuant to the Disbursement Procedures approved by the Court. Tab 13 and Tab 15 provide a detailed list of the transactions affecting the Primary Account that occurred during the reporting periods.

## Cash Position of GSWA

GSWA's cash position has remained stable during FY 2015, reflecting the strong management by the Receiver of the billing process. Cash increased during the second quarter of FY 2015 but declined to its previous level at $9.7 million at June 30, 2015. GSWA's cash position does not include cash in GSWA's reserves, including the new special reserve funded by cash previously used to reimburse the Government of Guam for debt service. Figure 36 outlines GSWA's cash position at the end of each fiscal year since the Receivership began.

Figure 36 Change in GSWA Cash Position (Million $)



## Status of Residential Customers

The number of curbside residential customers continued to increase during the reporting periods. On September 30, 2014, the number of residential customers was 16,849. On June 30, 2015, the number of residential customers was 17,558, an increase of 4.2 percent during the reporting period. Since March 2013, GSWA has added 1,047 curbside residential customers. Figure 37 illustrates the very stable base of GSWA residential customers with its recent growth trend over the previous four years.

Case 1:02-cv-00022  Document 1634-1  Filed 10/21/15  Page 38 of 56

The Naval Facilities Engineering Command (NAVFAC) is included as a commercial customer because it is managed by a private company and is otherwise very similar to other GSWA commercial customers.

All of the major commercial accounts were in good standing during the reporting period with the exception of Lagu Sanitation. Lagu continues to pay off its debt to GSWA and will not be in compliance with GSWA policy until the debt is fully paid.

### Status of GWA and Government Accounts

GWA remains in good standing, but most other direct government accounts are in arrears. With respect to the other Government of Guam accounts, we will continue to monitor carefully and support DOA when it needs our support, however, the balances owed from these GovGuam customers are addressed in the annual settlement process between the General Fund and GSWA as we described earlier in this Report.

### Status of the Construction Subaccount

Payments from the Construction Subaccount were $8,456,727.19 during the period January 1, 2015, through March 31, 2015. Interest earnings were added to the account in the amount of $4,564.41. Tab 14 provides a detailed listing of all transactions affecting the account during the period January 1, 2015 through March 31, 2015.

Payments from the Construction Subaccount were $6,543,472.83 during the period April 1, 2015 through June 30, 2015. Interest earnings were added to the account in the amount of $3,857.23. In addition, funds were transferred into the account from the Government of Guam's Construction account for the 2009 bonds in the amount of $11,988,464.87. It should be noted that this transfer completes the transfer of all construction funds from the 2009 Section 30 Bonds to the Receiver for funding Consent Decree projects. Tab 16 provides a detailed listing of all transactions affecting the account during the period April 1, 2015 through June 30, 2015.

Table 8 provides the Court with an accounting of the retainage being held for contractors paid from the Construction Subaccount.

#### Table 8 Retainage on Trustee Account Payments

| Retainage on Trustee Account Payments | | |
|---|---|---|
| As of 6/30/2015 | | |
| Company | Description | Amount |
| Brown and Caldwell | Retainage | $ 13,626.14 |
| Black Construction Corporation | Retainage | $ 2,043,000.67 |
| AECOM | Retainage | $ 9,798.50 |
| EA Science and Technology | Retainage | $ 11,346.61 |
| GHD (formerly Winzler & Kelly) | Retainage | $ 122,371.88 |
| Total Retainage Held...................................... | | $ 2,200,143.80 |

When the retainage obligations are considered, on June 30, 2015, the Construction Subaccount had a balance of $14,084,051.59 available for future Consent Decree obligations.

**Table 11 Range of Likely Payments to Former Landowners**

| | | | | Range of Potential Distribution of Payments | | | | |
| | | | | Scenario A | | Scenario B | | |
| | | | | | Estimated | | | Estimated |
| | | Allocation of | | Total Credits | Compensation | Total Credits | | Compensation |
| Former Owner | Total Liability* | Initial Payment | | Redeemed | Paid to Date | Redeemed | | Paid to Date |
|---|---|---|---|---|---|---|---|---|
| Oxford Properties & Finance, Ltd. | $ 17,182,984 | $ 1,700,938 | $ | 10,707,103 | $ 12,408,041 | $ 13,477,004 | $ | 15,177,942 |
| Calvo's Insurance Underwriters, Inc. | $ 8,440,197 | $ 850,469 | $ | 7,589,728 | $ 8,440,197 | $ 4,917,063 | $ | 5,767,532 |
| Valencia Investments Corporation | $ 2,749,277 | $ 272,150 | $ | 2,477,127 | $ 2,749,277 | $ 2,438,077 | $ | 2,710,228 |
| Jones and Guerrero Company, Inc | $ 2,749,277 | $ 272,150 | $ | 2,477,127 | $ 2,749,277 | $ 2,438,077 | $ | 2,710,228 |
| Alfred and Diana Ysrael | $ 1,715,266 | $ 170,094 | $ | - | $ 170,094 | $ - | $ | 170,094 |
| Lee and Joan Holmes | $ 499,326 | $ 51,028 | $ | 448,298 | $ 499,326 | $ 440,976 | $ | 492,004 |
| Douglas F. Cushnie | $ 413,171 | $ 42,285 | $ | 370,885 | $ 413,171 | $ 364,935 | $ | 407,220 |
| Joaquin C. Arriola | $ 276,702 | $ 28,321 | $ | 248,381 | $ 276,702 | $ 244,415 | $ | 272,736 |
| Young Chull Kim | $ 143,658 | $ 14,441 | $ | 129,217 | $ 143,658 | $ 127,320 | $ | 141,761 |
| *Totals* | $ 34,169,858 | $ 3,401,877 | $ | 24,447,867 | $ 27,849,744 | $ 24,447,867 | $ | 27,849,744 |

*Initial Payment based on appraised value plus the judgement of the Superior Court of Guam plus interest @ 6%

Scenario A in Table 11 assumes that all former landowners other than Oxford Properties & Finance LTD., and Alfred and Diana Ysrael were paid in full, with the balance of the $13,477,003.63 in tax credits claimed since October 1, 2014, being claimed by Oxford Properties & Finance Ltd. Scenario B assumes that all of the tax credits claimed since September 30, 2014, were applied to Oxford Properties & Finance Ltd's unpaid balance and that none went to the other former landowners. In any event, most of the judgment appears to have been paid as of August 20, 2015. As more information becomes available, we will provide further updates to the Court.

## Reserves of the GSWA

Table 12 outlines the status of the reserves of GSWA on June 30, 2015. These reserves are for the purpose of setting funds aside to pay for the future needs of the system.

**Table 12 Reserves of the Guam Solid Waste Authority**

| Reserves of the Guam Solid Waste Authority As of 6/30/2015 | | |
|---|---|---|
| **Reserves** | | **Total** |
| **Equipment Replacement Reserve** | $ | 2,391,161.73 |
| **New Cell Development Reserve** | $ | 180,425.72 |
| **Cell Closure Reserve** | $ | 180,407.23 |
| **Post-Closure Care Reserve Layon Landfill** | $ | 360,851.16 |
| **Post-Closure Care Reserve Ordot Dump** | $ | - |
| Total Reserves.......................................... | $ | 3,112,845.84 |

The status of the special account established to address the cost of legal expenses, future capital requirements and the post-closure care of the Ordot Dump is addressed elsewhere in this report.

occur after the Receivership ends, but they must be completed and they must be fully funded; therefore, a responsible financial plan must include funding them. Design of the next cell(s) should occur prior to immediate need, to ensure that the cells are ready when needed. Table 16 outlines the estimate of all of the capital costs that must be addressed to comply with the Consent Decree, the Orders of the District Court and GSWA's operating budget.

Table 16 Future Capital and Ordot Post-Closure Funding Requirements

| Future Capital and Ordot Post Closure Funding Requirements | |
| --- | --- |
| Funding Required | Total |
| Additional Projects | $ 9,442,900.00 |
| Post-closure cost for Ordot Dump | $15,670,893.97 |
| Construction of new cell at Layon | $10,590,642.09 |
| Closure cost for cells 1 & 2 | $ 5,273,975.41 |
| Total | $40,978,411.47 |

Table 17Table 17 shows the Receiver's recommended plan for the use of the $4.5 million in annual revenue that was previously used to reimburse the Government of Guam for debt service; to fund the upgrades to the residential transfer stations, the Dero Road upgrades, and the post-closure reserve for the Ordot Dump; and, to fund the other capital requirements of GSWA. Table 17 is also included as Tab 23 in larger type for the convenience of the reader.

Table 17 Future Capital and Ordot Post-Closure Funding Cash Flow

| | | Funding Requirement | | | | Funds Available | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Year | Additional Projects | Allocation of Funds to Ordot Dump Post-Closure Reserve | Closure Cost of Cells 1 &2 and New cell at Layon Landfill | Balance at Beginning of FY* | Funds Added During FY (Includes Actual and Estimated Interest Earnings) | Funds Used for Capital and Ordot Post-Closure Expense During FY | Funds Used for Legal Expense During FY | Balance at End of FY |
| FY2014 | | | | $ 2,437,501.89 | $ 1,873,790.40 | $ - | | $ 4,311,292.29 |
| FY2015 | | | | $ 4,311,292.29 | $ 4,500,314.89 | $ - | $ 77,441.35 | $ 8,734,165.83 |
| FY2016 | $ 4,721,450.00 | $ 2,000,000.00 | | $ 8,734,165.83 | $ 4,501,596.96 | $ 6,721,450.00 | $ 100,000.00 | $ 6,414,312.79 |
| FY2017 | $ 4,721,450.00 | $ 2,000,000.00 | | $ 6,414,312.79 | $ 4,501,596.96 | $ 6,721,450.00 | $ 100,000.00 | $ 4,094,459.75 |
| FY2018 | $ - | $ 2,000,000.00 | | $ 4,094,459.75 | $ 4,501,596.96 | $ 2,000,000.00 | $ 100,000.00 | $ 6,496,056.71 |
| FY2019 | $ - | $ 2,000,000.00 | | $ 6,496,056.71 | $ 4,501,596.96 | $ 2,000,000.00 | $ 100,000.00 | $ 8,897,653.67 |
| FY2020 | $ - | $ 2,000,000.00 | $ 5,295,321.05 | $ 8,897,653.67 | $ 4,501,596.96 | $ 7,295,321.05 | $ 100,000.00 | $ 6,003,929.59 |
| FY2021 | $ - | $ 2,000,000.00 | $ 7,932,308.75 | $ 6,003,929.59 | $ 4,501,596.96 | $ 9,932,308.75 | $ 100,000.00 | $ 473,217.80 |
| FY2022 | | $ 2,000,000.00 | $ 2,636,987.71 | $ 473,217.80 | $ 4,501,596.96 | $ 4,636,987.71 | $ 100,000.00 | $ 237,827.05 |
| FY2023 | | $ 1,670,900.00 | | $ 237,827.05 | $ 4,501,596.96 | $ 1,670,900.00 | $ 100,000.00 | $ 2,968,524.01 |
| FY2024 | | | | $ 2,968,524.01 | $ 4,501,596.96 | $ - | $ 100,000.00 | $ 7,370,120.97 |
| FY2025 | | | | $ 7,370,120.97 | $ 4,501,596.96 | $ - | $ 100,000.00 | $11,771,717.93 |

*For FY14 the beginning balance is May 1, the first month these funds were set aside for this purpose.

Note: Shaded areas are estimates. Areas not shaded are actual expenditures and funds available.

The additional projects will be completed over calendar year 2016 and 2017. This timeframe provides the following benefits:

**EXHIBIT F**

**ECF No. 1687-1 Quarterly Report of the Receiver, pp. 1, 31 and 32**

**(November 7, 2016)**

# Quarterly Report of the Receiver

## Civil Case No. 02-00022
## United States of America v. Government of Guam
## Guam Solid Waste Authority

Prepared for:



## U.S. District Court of Guam

Submitted by:



Gershman, Brickner & Bratton, Inc.
8550 Arlington Blvd, Suite 304
Fairfax, Virginia 22031

## November 8, 2016

Printed on recycled paper

Our fund balance analysis for the period ended June 30, 2016, indicates an estimated increase for FY 2016 in fund balance of $4.3 million. Table 5 outlines the elements of the estimate.

Table 5 – GSWA Fund Balance[6]

| Guam Solid Waste Authority<br>Fund Balance<br>30-Jun-16 | | |
|---|---|---|
| **Elements of Fund Balance** | **Amount** | |
| Actual Fund Balance @ 9/30/15 | $ | 19,811,362 |
| Revenue FY 2016 | $ | 14,099,007 |
| Expenses FY 2016 | $ | 9,788,867 |
| Excess (Deficit) FY 2016 | $ | 4,310,140 |
| Actual Fund Balance @ 9/30/16 | $ | 24,121,502 |
| Note: Revenue is on accrual basis. | | |

Fund balance continues to grow at a much faster rate since we are now accumulating funds, pursuant to the Orders of this Court, to pay for the rehabilitation of Dero Road, upgrades to the residential transfer stations, the environmental closure of the Dededo Residential Transfer Station and the post-closure care of the Ordot Dump. Figure 20 illustrates how the fund balance from operations have changed over the time GSWA has been in receivership.

(Content continues on Next Page)

---

[6] See footnote 3 of the Receiver's Quarterly Report dated August 4, 2016.

Figure 20 – Growth in Fund Balance FY2009 to FY2016



Payments for operating expenses of GSWA are made through the DOA and through the Receiver's trust account known as the Primary Account. Payments made by the Receiver are handled pursuant to the Disbursement Procedures approved by the Court. Tab 9 provides a detailed list of the transactions affecting the Primary Account that occurred during the reporting period. Payments are also made from the Construction Subaccount (for capital expenses) and the Reserve for Unfunded Expenses (for capital expenses and certain operating expenses for the Ordot Dump). These payments will be addressed later in this Report.

## Cash Position of GSWA

Operating cash position has remained relatively stable during FY 2016 fluctuating near $9.9 million. GSWA's reserves, including the reserve for unfunded projects, are not included in GSWA's operating cash position since these funds are not available to pay routine operating expenses. Figure 21 outlines GSWA's cash position at the end of each fiscal year since the Receivership began.

**EXHIBIT G**

**ECF No. 1706 Judgment, Findings of Fact and Conclusions of Law, pp. 5 - 14**

**(January 6, 2017)**

K. Fowler, Esq.

FILED
SUPERIOR COURT
OF GUAM

2016 DEC 16 PM 4: 46

CLERK OF COURT

IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| GUAM SOLID WASTE AUTHORITY OF THE GOVERNMENT OF GUAM, | CIVIL CASE NO. CV 0185-15 |
| Plaintiff, | |
| v. | **JUDGEMENT** |
| DORIS FLORES BROOKS, as PUBLIC AUDITOR, OFFICE OF PUBLIC ACCOUNTABILITY; AND MORRICO EQUIPMENT, L.L.C., | Dooley Roberts Fowler & Visosky LLP<br><br>DEC 19 2016<br><br>4:59 NiK |
| Defendants. | |

In accordance with the Findings of Fact and Conclusions of Law issued by the Honorable Arthur R. Barcinas on ___DEC 16 2016___, the Court NOW ENTERS JUDGEMENT ACCORDINGLY:

    A. The Decision and Order issued by the Public Auditor in Procurement Appeal Number OPA-PA-140-010, In the Appeal of Morrico Equipment, LLC, involving Appellant Morrico Equipment LLC and Respondent Guam Solid Waste Authority of the Government of Guam, is affirmed.

    B. All Parties shall bear their own attorneys' fees, costs, and expenses.

SO ADJUDGED this day of ___DEC 16 2016___.

I do hereby certify that the foregoing is a full true and correct copy of the ORIGINAL on file in the Office of the Clerk of Court Superior Court of Guam.

DEC 16 2016

DEPUTY CLERK, CLERK OF COURT

HONORABLE ARTHUR R. BARCINAS
Judge, Superior Court of Guam

**EXHIBIT A**

K. Fowler, Esq

FILED
SUPERIOR COURT
OF GUAM

2016 DEC 16 PM 4: 46

CLERK OF COURT
BY

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| GUAM SOLID WASTE AUTHORITY OF THE GOVERNMENT OF GUAM, | CIVIL CASE NO. CV 0185-15 |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| DORIS FLORES BROOKS, as PUBLIC AUDITOR, OFFICE OF PUBLIC ACCOUNTABILITY; AND MORRICO EQUIPMENT, L.L.C., | Dooley Roberts Fowler & Visosky LLP |
| | DEC 19 2016 |
| Defendants. | 4:59 NiK |

**EXHIBIT A**

### INTRODUCTION

This matter came before the Honorable Arthur R. Barcinas on September 13, 2016, during a status hearing. Attorney Vanessa L. Williams represented Plaintiff Guam Solid Waste Authority ("GSWA"). Attorney Delia Lujan Wolff represented Defendant Doris Flores Brooks in her capacity as Public Auditor, and Attorney Kevin J. Fowler represented Defendant Morrico Equipment, L.L.C. ("Morrico"). At a bench trial on August 2, 2016, the parties agreed to submit trial briefs, and during a status hearing on September 13, 2016, the parties submitted on their briefs and the Court took the matter under advisement. Based on a review of the pleadings and applicable statutes, the Court now issues the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

By a preponderance of the evidence, the Court makes the following finds of fact:

1

**EXHIBIT B**

Findings of Fact and Conclusions of Law
*Guam Solid Waste Authority v. Doris Flores Brooks and Morrico Equipment, LLC,* Civil Case No. CV 0185-15

1. On September 18, 2014, GSWA issued a solicitation of procurement for refuse collections trucks, IFB GSWA0001-15 ("IFB"), seeking to procure three (3) 25-Cubic Yard refuse trucks and two (2) 10-Cubic Yard refuse trucks.

2. The IFB specified that submitted bids must include vehicles that had a cab forward design. A cab forward design is one in which the cab of the vehicle is situated forward of the front axles of the vehicles.

3. On September 23, 2014, at a pre-bid conference, GSWA's Linda Ibanez stated that if anyone had questions or required explanation, "you [attendees] would address it in writing and if we [GSWA] feel there is an addendum we will send it to you by email or fax." OPA Record, Tab 29, Decision, p.2, ¶ 4.

4. Ross Morrison of Morrico inquired whether GSWA would accept a manufacturer's bid for a refuse truck in a conventional cab configuration, if the conventional cab truck met or exceeded the turn radius specifications provided by a cab forward truck.

5. In response to Mr. Morrison's question, GSWA orally denied Morrico's request, but also invited Morrico to submit their question in writing for the GSWA's review.

6. On September 25, 2014, Morrico submitted to GSWA pre-bid questions for the IFB. Morrico requested that the bid specification permit a conventional cab design.

7. On October 1, 2014, GSWA issued Addendum No. 1 to the IFB, to all prospective bidders, including Morrico. Addendum No. 1 amended certain specifications, but did not amend the cab forward specifications to allow conventional cab designs, as requested by Morrico.

8. On October 4, 2014, GSWA issued Addendum No. 2 to the IFB, which postponed the bid opening from October 6, 2014, to October 15, 2014, due to the National Weather Service's issuance of a Typhoon Watch for Guam, Rota, Tinian, and Saipan.

9. On October 9, 2014, eight (8) days after receiving Addendum No. 1, Morrico filed a Procurement Protest with GSWA protesting GSWA's refusal to amend its specifications requiring a cab forward design in its procurement of the refuse trucks,

Findings of Fact and Conclusions of Law
*Guam Solid Waste Authority v. Doris Flores Brooks and Morrico Equipment, LLC*, Civil Case No. CV 0185-15

despite Morrico's request for such an amendment in its submitted pre-bid questions on September 25, 2014.

10. On October 10, 2014, GSWA issued a Stay of Procurement.

11. On October 22, 2014, GSWA denied Morrico's Procurement Protest in a letter dated October 22, 2014, and received by Morrico on October 24, 2014. GSWA ruled that Morrico's protest was untimely, and that the cab forward specification was required for the operation of GSWA's new refuse trucks.

12. On November 6, 2014, GSWA issued Addendum No. 3, which provided a new date of November 21, 2014, at 10 AM, for the opening of bids.

13. On November 6, 2014, Morrico filed their procurement appeal with the Office of the Public Auditor ("the OPA"). Morrico's appealed GSWA's decision on the timeliness of their protest, as well as GSWA's decision on the necessity of the cab forward specification.

14. On November 24, 2014, GSWA filed a Motion with the OPA to Dismiss Morrico's Appeal for lack of jurisdiction due to Morrico's failure to timely file their protest.

15. On December 19, 2014, Morrico filed their Opposition to GSWA's Motion to Dismiss.

16. On January 2, 2015, GSWA filed a Reply brief in support of its Motion to Dismiss.

17. On January 20, 2015, the OPA held a formal hearing on Morrico's appeal and GSWA's motion. At the hearing, the parties introduced evidence which included: the OPA's visit and tour outside and inside cab forward and conventional cab refuse trucks, testimony by the head of the purchasing agency in the supervision of the procurement of refuse trucks, promotional marketing materials from Morrico stating that cab forward truck designs were the industry standard in urban areas, and video footage of actual GSWA cab forward and conventional cab refuse trucks attempting to safely and efficiently maneuver in and out of cul-de-sacs in Guam.

18. On February 20, 2015, the Public Auditor released her Decision and Order on GSWA's motion and Morrico's appeal. The Public Auditor disagreed with GSWA's

Page 3 of 9

Findings of Fact and Conclusions of Law
*Guam Solid Waste Authority v. Doris Flores Brooks and Morrico Equipment, LLC*, Civil Case No. CV 0185-15

argument that the publication of the IFB gave vendors constructive notice and started the fourteen (14) day clock to file a protest, nor did she find that Morrico's receipt of the IFB start the fourteen (14) day clock. Furthermore, the Public Auditor also found that, while GSWA orally notified attendees of the pre-bid conference that conventional cab designs would not be considered, the IFB instructed bidders that any pre-award oral explanations or instructions would not be binding. Morrico would be required to submit any instructions or addendums in writing. Therefore, the Public Auditor found that, as Morrico filed their protest within fourteen (14) days of GSWA's issuance of Addendum No. 1, Morrico's protest was timely made. The Public Auditor denied GSWA's Motion to Dismiss Morrico's Appeal.

19. The Public Auditor also found that the IFB's cab forward specification unnecessarily restricted competition in violation of 5 GCA § 5268(a). The Public Auditor found that Morrico's conventional cab refuse truck bid met GSWA's minimum requirement that the refuse trucks be able to pick up trash safely and efficiently. The Public Auditor noted that GSWA's procurement record did not include any papers or materials used by GSWA to develop its IFB specifications, as required by 5 GCA § 5249(d). Absent the information from the procurement record detailing GSWA's development of its IFB specifications, the Public Auditor concluded that she was unable to review GSWA's justification in requiring solely the cab forward specification as stated in the IFB.

20. The Public Auditor granted Morrico's procurement appeal in her Decision and Order, and ordered GSWA to immediately amend the IFB to allow vendors to submit bids that included conventional cab refuse truck models.

21. On March 6, 2015, GSWA filed its Verified Complaint for Judicial Review in this instant case; CV0185-15.

22. On April 29, 2015, the Public Auditor filed her Answer to GSWA's Verified Complaint for Judicial Review.

Page 4 of 9

Findings of Fact and Conclusions of Law
*Guam Solid Waste Authority v. Doris Flores Brooks and Morrico Equipment, LLC*, Civil Case No. CV 0185-15

23. On April 29, 2015, the Public Auditor also filed a Motion to Dismiss for lack of jurisdiction. She argued that the GSWA's Verified Complaint did not include GSWA's head, Mr. David Manning's, authorization of GSWA's appeal the OPA decision.

24. On May 7, 2015, Morrico filed a Motion to Dismiss for lack of jurisdiction and failure to state a claim. Morrico argued that GSWA's complaint lacked Mr. Manning's authorization of an appeal. Morrico also argued that GSWA's Complaint failed to state a cause of action because it failed to plead the requisite statutory authorization for the appeal.

25. On June 4, 2015, GSWA filed an Opposition to Defendants' Motions to Dismiss.

26. On June 19, 2015, GSWA filed a Motion for Leave to File Amended Complaint. In its Motion, GSWA requested the Court for leave to amend the original Complaint to include the express allegation that the appeal was recommended by the head of the purchasing agency, Mr. Manning.

27. On July 17, 2015, both Morrico and the Public Auditor submitted Oppositions to GSWA's Motion for Leave to File Amended Complaint.

28. On September 16, 2015, the Court issued its Decision and Order granting GSWA's Motion for Leave to File Amended Complaint. The Court also denied Defendants' Motions to Dismiss as their arguments were moot.

29. GSWA filed its First Amended Complaint for Judicial Review on September 22, 2015. The First Amended Complaint included Mr. Manning's recommendation that GSWA pursue the appeal.

30. The Public Auditor and Morrico each filed their Answers to GSWA's First Amended Complaint on October 2, 2015.

31. On May 17, 2016, Morrico filed a Motion to Consolidate. Morrico requested the Court to consolidate *GSWA c. Brooks, et al.* (CV0185-15), and *GSWA v. Brooks, et al.* (CV0370-16).

Findings of Fact and Conclusions of Law
*Guam Solid Waste Authority v. Doris Flores Brooks and Morrico Equipment, LLC*, Civil Case No. CV 0185-15

32. On August 2, 2016, the Court held a bench trial for this instant case. At the bench trial, the parties agreed to a paper trial. All parties were given until August 23, 2016, to submit their trial briefs; opposition briefs would be due on August 26, 2016. The Court also scheduled a status hearing on September 13, 2016, at 2 PM, to discuss the briefs and the case.

33. Morrico and GSWA each filed a trial brief with the Court on August 23, 2016.

34. On August 26, 2016, GSWA filed its Response to Morrico's brief.

35. On August 26, 2016, the Public Auditor and Morrico, each, filed a Response Brief to GSWA's trial brief.

36. At the status hearing on September 12, 2016, the Court declined to consolidate the two cases and denied Morrico's Motion to Consolidate. Thereafter, parties all submitted on their briefs for the bench trial before the Court and the Court took the matter under advisement.

## CONCLUSIONS OF LAW

The Court now issues the following conclusions of law on the matters:

1. The Court has subject matter jurisdiction over this action pursuant to 5 GCA § 5480(a).

2. Title 5 GCA Section 5425(a) allows any actual or prospective bidders, who have grievances with the procurement process, to submit a written protest to the Chief Procurement Officer, the Director of Public Works, or the head of a purchasing agency within fourteen (14) days after the aggrieved person knows or should know of the facts giving rise to the grievance.

3. GSWA released the IFB on September 18, 2014. The original IFB required bidders to submit cab forward model refuse trucks. The IFB also required bidders to submit any questions or requests for clarification in writing, and that any official response or addendum published by GSWA would be provided in writing. At a pre-bid conference on September 23, 2014, Morrico verbally inquired whether conventional cab model refuse trucks, which met the safety and turning radius requirements, would be accepted

Page 6 of 9

by GSWA. GSWA orally denied Morrico's request, but invited Morrico to submit their question in writing, and said that GSWA would investigate. Morrico submitted their written GSWA pre-bid questions on September 25, 2014. On October 1, 2014, GSWA issued Addendum No. 1, which amended certain specifications, but left the cab forward specifications unchanged. Morrico became an aggrieved party when they received confirmation that their conventional cab model refuse trucks would not be considered. Morrico filed their protest on October 9, 2014, or eight (8) days after receipt of Addendum No. 1. Morrico filed their protest within the fourteen (14) day window of time. Therefore, pursuant to 5 GCA § 5425(a), Morrico's protest was timely filed with the OPA.

4. GSWA failed to sustain its burden of proof to prove that the OPA's Decision was arbitrary, capricious, fraudulent, clearly erroneous or contrary to law. The Public Auditor's Decision is therefore conclusive.

5. Title 5 GCA Section 5267 requires a procurement record to include "the person responsible for drafting the specifications and any persons, technical literature, or manufacturer's brochures relied upon by the responsible person in drafting the specifications."

6. Title 5 GCA Section 5429(d) requires a procurement record to include "brochures and submittals of potential vendors, manufacturers or contractors, and all drafts, signed and dated by the draftsman, and other papers or materials used in the development of specifications."

7. Title 5 GCA Section 5265 states: "All specifications shall seek to promote overall economy for the purposes intended and encourage competition in satisfying the Territory's needs, and shall not be unduly restrictive."

8. It is undisputed that both cab forward model refuse trucks and conventional cab model refuse trucks are capable of collecting trash in Guam.

9. The purpose of GSWA's procurement of the refuse trucks was to meet the Territory's refuse collection needs. GSWA required bidders to submit refuse trucks that

Page 7 of 9

would collect refuse efficiently and safely. However, GSWA, when drafting the IFB, restricted bid submissions only to bidders offering cab forward models. If conventional cab model refuse trucks are capable of collecting refuse as safely and as efficiently as cab forward model refuse trucks, GSWA must justify the IFB's restriction. To produce such justification, under 5 GCA § 5429(d), GSWA must provide for the procurement record any papers or materials that lead GSWA to disqualify conventional cab models and to determine that the cab forward requirement was necessary and an essential physical characteristic and function to meet Guam's minimum needs in safely and efficiently collecting refuse. Absent justification, GSWA cannot prove the necessity of the cab forward specification and the IFB's cab forward specifications become unduly restrictive in violation of 5 GCA §§ 5265 and 5268(a).

The Public Auditor noted in her Decision that the procurement record included no papers or materials used by GSWA during the development of the IFB specifications, which violated 5 GCA § 5429(d). The Public Auditor could not determine whether the IFB's cab forward specification was necessary, and found that the cab forward specification was unnecessarily restrictive to competition. Although GSWA argues that papers or materials were not required as GSWA's head, Mr. R. Chace Anderson, designed the cab forward specifications based upon his experience and expertise, the Court finds it doubtful that Mr. Anderson's command of refuse truck technical specifications could allow him to reach his conclusion without the benefit of supplementary material. Even if Mr. Anderson's experience and expertise was critical to GSWA when developing its specifications, Mr. Anderson's experience and expertise cannot cure the deficiency in the procurement record. Therefore, the IFB's cab forward specification unduly restricts competition in violation of 5 GCA §§ 5265 and 5268(a).

10. GSWA failed to sustain its burden of proof to prove that the OPA's Decision was arbitrary, capricious, fraudulent, clearly erroneous or contrary to law. The Public Auditor's Decision is therefore conclusive.

Findings of Fact and Conclusions of Law
*Guam Solid Waste Authority v. Doris Flores Brooks and Morrico Equipment, LLC*, Civil Case No. CV 0185-15

11. The Court AFFIRMS the Public Auditor's Decision and Order. Morrico's procurement appeal is granted and GSWA shall immediately amend the IFB to allow vendors to bid conventional cab models for the refuse collection trucks to be procured in the IFB.

12. Any Finding of Fact stating a Conclusion of Law shall be deemed a Conclusion of Law, and any Conclusion of Law stating a Finding of Fact shall be deemed a Finding of Fact.

## CONCLUSION

Based upon the foregoing, and after making findings upon a preponderance of the evidence, the Court AFFIRMS the Public Auditor's Decision and ORDERS GSWA to immediately amend the IFB to allow vendors to bid conventional cab models for the refuse collection trucks to be procured in IFB GSWA0001-15.

IT IS SO ORDERED this day of ___**DEC 1 6 2016**___.

HONORABLE ARTHUR R. BARCINAS
Judge, Superior Court of Guam

I do hereby certify that the foregoing is a
full true and correct copy of the ORIGINAL
on file in the Office of the Clerk of
Court, Superior Court of Guam

DEC 1 6 2016

_____
DEPUTY CLERK, Superior Court of

Page 9 of 9

**EXHIBIT H**

**ECF No. 55 Consent Decree, pp. 1, 4, 5, 8 and 11**

**(February 11, 2004)**

**ORIGINAL** 02-cv-00022    Document 55    Filed 02/11/2004    Page 1 of 80

1  THOMAS L. SANSONETTI
   Assistant Attorney General
2  Environment & Natural Resources Division
   United States Department of Justice
3  ROBERT D. MULLANEY
   Environmental Enforcement Section
4  Environment & Natural Resources Division
   301 Howard Street, Suite 1050
5  San Francisco, CA 94105
   Telephone: (415) 744-6491
6  Fax: (415) 744-6476
   LEONARDO M. RAPADAS
7  United States Attorney
   MIKEL W. SCHWAB
8  Assistant U.S. Attorney
   Suite 500, Sirena Plaza
9  108 Hernan Cortez
   Hagatna, Guam 96910
10 Telephone: (671) 472-7332
   Fax: (671) 472-7215
11

12 Attorneys for the United States of America

13

14                UNITED STATES DISTRICT COURT
                      TERRITORY OF GUAM
15

16

17
   UNITED STATES OF AMERICA,          )        CIVIL CASE NO. 02-00022
18                                     )
              Plaintiff,               )
19                                     )
        v.                             )
20 GOVERNMENT OF GUAM,                 )        CONSENT DECREE
                                       )
              Defendant.               )
21 _____)

22

23

24

25

26

27

28

FILED
DISTRICT COURT OF GUAM
FEB 11 2004
MARY L. M. MORAN
CLERK OF COURT

1    relieve the Government of Guam from the obligations of this Consent Decree.

2    4.    Within TEN (10) days from the entry of this Consent Decree and as appropriate
3    thereafter, the Government of Guam shall provide copies of this Consent Decree, accompanied
4    by a summary explanation of its terms, to all persons who are bound by this Consent Decree as
5    specified in Paragraph 2 or who are in a position to ensure or affect compliance with this Consent
6    Decree, including notice to any successors in interest to property governed by this Consent
7    Decree prior to the transfer of said property. The Government of Guam shall provide a copy of
8    this Consent Decree to any contractor or consultant retained to perform any activity required by
9    this Consent Decree. No later than TEN (10) days after any such notice, the Government of
10   Guam shall provide U.S. EPA with a copy of its summary explanation and a list of the names,
11   titles, and addresses of all recipients.

12                                        III.  CIVIL PENALTY

13   5.    The Government of Guam shall pay a civil penalty of $200,000 to the United
14   States in accordance with Paragraph 6 below.

15   6.    Payments shall be made by wire transfers payable to the United States Department
16   of Justice in accordance with the FEDWIRE Electronic Funds Transfer instructions (forms
17   attached as Appendix A) at the following times:

18       a.    Thirty days after the effective date in the amount of $25,000;

19       b.    One (1) year after the effective date in the amount of $50,000;

20       c.    Two (2) years after the effective date in the amount of $50,000; and

21       d.    Three (3) years after the effective date in the amount of $75,000.

22                                        IV.  COMPLIANCE

23   7.    The Government of Guam shall correct all compliance problems that form the
24   basis for the Complaint filed in this action by undertaking the actions identified below within the
25   specified times. Unless otherwise specified, the times given in days refer to calendar days from
26   the date of entry of this Consent Decree. U.S. EPA may, at its discretion, review documents

27

28                                            4

1   submitted by the Government of Guam concerning operation and closure of Ordot Dump and the
2   construction or operation of the new Municipal Solid Waste Landfill ("MSWLF"). In the event
3   that U.S. EPA provides written comments, the Government of Guam must respond in writing
4   within 30 days and incorporate such comments into the document. Representatives of the Parties
5   shall make themselves readily available during and after the comment period to informally
6   discuss questions and comments on any documents.

7       a.    For purposes of this Consent Decree, (i) "Ordot Dump" shall refer to Ordot Dump
8   in its current configuration and current boundaries as depicted in Appendix B; and (ii) the new
9   Municipal Solid Waste Landfill or "MSWLF" shall include the option of constructing and
10  operating new cells at a location adjacent to the Ordot Dump location.

11      8.    Closure of Ordot Dump and Cessation of Discharge of Pollutants from Ordot
12  Dump into Waters of the United States.

13      a.    Within 300 days (approximately 10 months), DPW shall:

14          i.    Submit a Draft Closure Plan to U.S. EPA that shall include, but not be
15          limited to:

16              -   Site investigation, survey & mapping.

17              -   Environmental baseline survey.

18              -   40% (conceptual) design of the dump cover system including methods and
19                  procedures to be used to install the cover system and operational plans to
20                  implement measures to cease discharge of pollutants into waters of the
21                  United States.

22              -   40% (conceptual) design of perimeter surface water diversion system.

23              -   Other measures necessary to comply with Government of Guam
24                  regulations regarding closure of municipal solid waste landfills (22
25                  G.A.R. § 23601).

26          ii.   Submit a permit application to GEPA pursuant to Government of Guam

27

28                                          5

1      f.    Within 700 days (approximately 23 months), DPW shall advertise for bids to
2    construct Ordot closure plans and specifications.

3      g.   Within 800 days (approximately 27 months), DPW shall award a construction
4    contract for Ordot Dump closure and provide a notice to proceed to the selected
5    contractor and submit evidence of such award and notice to U.S. EPA.

6      h.   Within 1,350 days (approximately 45 months), DPW shall complete closure of
7    Ordot Dump, begin implementation of the post-closure plan in accordance with
8    Government of Guam requirements, and submit a certification to U.S. EPA that
9    the Ordot Dump no longer receives municipal solid waste for disposal.

10      i.    Within 1,350 days (approximately 45 months), DPW shall cease all discharges to
11    waters of the United States and submit a certification to U.S. EPA that discharges
12    to waters of the United States from the Ordot Dump have ceased.

13    9.    Construction and Operation of New Municipal Solid Waste Landfill ("MSWLF").
14      a.   Within 30 days, DPW shall submit a list of at least three potential landfill sites to
15    U.S. EPA and GEPA. Within 300 days (approximately 10 months), DPW shall complete
16    an Environmental Impact Statement ("EIS") that includes a detailed analysis and
17    comparison of at least three potential landfill sites for the MSWLF and identifies DPW's
18    preferred alternative for the MSWLF. DPW shall provide U.S. EPA and GEPA with a
19    copy of the draft and final EIS within 10 days after completion of the draft and final EIS.

20      b.   If U.S. EPA does not agree with DPW's preferred alternative, the parties shall use
21    their best efforts to come to an agreement regarding the location of the new MSWLF
22    within 90 days after completion of the final EIS. If the parties are unable to agree on a
23    location, the Government of Guam shall file a motion within 110 days after completion of
24    the final EIS, submitting the disputed matter to the Court for resolution. The Government
25    of Guam's motion shall request oral argument and shall be set for hearing not less than 45
26    after service of the moving papers. The United States shall have 30 days to respond to

27

28                8

denial to U.S. EPA.

h.    Within 975 days (approximately 32 months), DPW shall award a construction contract for the new MSWLF in accordance with applicable procurement rules and policies of the Government of Guam and provide a notice to proceed to the selected contractor and submit evidence of such award and notice to U.S. EPA.

i.    Within 1,320 days (approximately 44 months), DPW shall begin operations of the new MSWLF and so certify to U.S. EPA within 7 days of commencement of operation.

10.    Financing Closure of Ordot Dump and Construction and Operation of New Municipal Solid Waste Landfill.

a.    Within 120 days, the Government of Guam shall submit to U.S. EPA a financial plan for funding those actions identified in Paragraphs 8 and 9, over time, including the funding source or sources and a schedule to secure funds for the capital and operating costs necessary to fully implement those actions identified in Paragraphs 8 and 9 above. The parties acknowledge and agree that the total amount of funding needed to complete the projects required under this Consent Decree is not currently available. The parties agree that the projects shall be funded by the Solid Waste Operations Fund, established by 10 G.C.A. § 51118, including the costs and expenses directly related to the closure of the Ordot Dump and the development, design, construction, and operation of a new sanitary landfill. The parties also agree that the Solid Waste Operations Fund shall not be regarded as the exclusive source of funding for the projects, and that the Government of Guam may obtain funding from other sources. The Government of Guam shall use its best efforts to obtain sufficient funding to fully implement the projects required by this Consent Decree. If funding from the Solid Waste Operations Fund is not sufficient to fully implement the projects, the Government of Guam shall seek funding through legislative appropriation, loans, grants, and rates charged for consumer services such as tipping or user fees.

b.    Notwithstanding any of the time frames set forth in Paragraph 8 or 9 above, upon

11

**EXHIBIT I**

**February 10, 2017, Order of the Supreme Court of Guam
dismissing the appeal of the Guam Solid Waste Authority in
Supreme Court Case NO. CVA17-001**

**(February 10, 2017)**



**Filed**
Supreme Court of Guam, Clerk of Court

1

2

3    **IN THE SUPREME COURT OF GUAM**

4  | **GUAM SOLID WASTE AUTHORITY**       )    Supreme Court Case No. CVA17-001
     | **OF THE GOVERNMENT OF GUAM,**       )    Superior Court Case No. CV0185-15

5                                           )

6            Plaintiff-Appellant,           )
                                            )           **ORDER**
7          vs.                              )
                                            )
8  | **DORIS FLORES BROOKS, as**            )
     **PUBLIC AUDITOR, OFFICE OF**          )
9  | **PUBLIC ACCOUNTABILITY; AND**         )
     **MORRICO EQUIPMENT, LLC.,**           )
10                                          )

11           Defendants-Appellees.          )

12

13        Plaintiff-Appellant Guam Solid Waste Authority of the Government of Guam filed a

14   notice of appeal on January 17, 2017.  Guam Rules of Appellate Procedure (GRAP) 8(a)

15   requires that an appellant pay the required docketing fee to the Supreme Court when a notice of

16   appeal is filed.  The Supreme Court Clerk's office issued a notice of prospective dismissal

17   advising the Appellant of its duty to pay this required fee or the appeal may be subject to

18

19   dismissal. *See* GRAP 8(a) Notice (Jan. 17, 2017).  No docketing fee has been paid.

20        Further, GRAP 4.1 requires that, within ten days of the filing of the notice of appeal, the

21   appellant shall file a statement of jurisdiction, which shall include among other things the date

22   of entry into the Superior Court docket of the judgment appealed from as well as a copy of the

23

24   judgment.    Guam R. App. P. 4.1(a).  If the appellant fails to timely file a statement of

25   jurisdiction as required, the case shall be dismissed for lack of jurisdiction. GRAP 4.1(b). The

26   Supreme Court Clerk's office issued a notice of prospective dismissal advising the Appellant of

27   this requirement.  *See* GRAP 4.1 Notice (Jan. 17, 2017).    In this case, no statement of

28

**E-Received**
2/10/2017 3:57:52 PM

1  jurisdiction has been filed, and the time to do so has expired.  Therefore, the matter is hereby

2  **DISMISSED** for lack of jurisdiction.

3

4

5       **SO ORDERED** this 10th day of February, 2016.

6

7

8                                               /s/
                                    **KATHERINE A. MARAMAN**
9                                        **Chief Justice**

10

11

12

13

14

15   I do hereby certify that the foregoing is a full true
     and correct copy of the original on file in the
16   office of the clerk of the Supreme Court of Guam.

17            APR 0 5 2017

18   BY: **AARON T. QUITUGUA**
               Deputy Clerk
19          Supreme Court of Guam

20

21

22

23

24

25

26

27

28

**EXHIBIT J**

**ECF No. 1686-7 Order Enforcing Ex Parte Application for
Automatic Stay Under 5 GCA § 5425(g)**

**(November 4, 2016)**

V. Williams, Esq.

FILED
SUPERIOR COURT
OF GUAM

16 OCT 28 PM 3: 15

CLERK OF COURT

DOOLEY ROBERTS FOWLER & VISOSKY LLP
865 South Marine Corps Drive, Suite 201
Tamuning, Guam 96913
Telephone: (671) 646-1222
Facsimile: (671) 646-1223
E-mail: fowler@guamlawoffice.com

RECEIVED
10:15 am
OCT 2 8 2016

Attorneys for
Morrico Equipment, LLC

CLERK'S OFFICE
SUPERIOR COURT OF GUAM

IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| GUAM SOLID WASTE AUTHORITY OF THE GOVERNMENT OF GUAM ) )   ) ) Plaintiff, ) )   ) vs. ) )   ) DORIS FLORES BROOKS, as PUBLIC ) AUDITOR, OFFICE OF PUBLIC ) ACCOUNTABILITY; AND MORRICO ) EQUIPMENT, LLC. ) )   ) Defendants. ) ) | CIVIL CASE NO. CV0185-15  **ORDER ENFORCING EX PARTE APPLICATION FOR AUTOMATIC STAY UNDER 5 GCA § 5425(g)** |

This matter came before the Court pursuant to Morrico Equipment, LLC's ("Morrico") ex

parte application for an order enforcing the automatic stay under 5 GCA § 5425(g).

For good cause shown, Morrico's ex parte application for automatic stay is hereby granted.

The Guam Solid Waste Authority shall not proceed further with the solicitation or with an award of

a contract for the refuse trucks at issue in this matter, under GSWA 002-017.

**SO ORDERED** this _____ day of OCT 2 8 2016 , 2016

I do hereby certify that the foregoing is a full true and correct copy of the ORIGINAL on file in the Office of the Clerk of Court, Superior Court of Guam

JEROME K.J. DUENAS
DEPUTY CLERK, Superior Court of

**THE HONORABLE ARTHUR R. BARCINAS**
Judge, Superior Court of Guam